## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ENERGY FUTURE HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| *Debtors.* | (Jointly Administered) |
| CSC TRUST COMPANY OF DELAWARE, as INDENTURE TRUSTEE and COLLATERAL TRUSTEE, | |
| *Plaintiff,* | |
| v. | Adversary Proceeding No. 14-_____ |
| COMPUTERSHARE TRUST COMPANY, N.A., COMPUTERSHARE TRUST COMPANY OF CANADA, EPIQ SYSTEMS, INC., THE DEPOSITORY TRUST COMPANY, and CEDE & CO. | |
| *Defendants.* | |

## COMPLAINT

1.    CSC Trust Company of Delaware ("CSC Trust"), as (i) indenture trustee

(the "First Lien Indenture Trustee")[1] for the 10% notes ("First Lien Notes") issued by

---

[1] The First Lien Indenture Trustee files this complaint at the written direction of holders with a majority in principal amount of the First Lien Notes.  CSC Trust is also the indenture trustee for the approximately $502.7 million in principal amount of 6.875% first lien notes due 2017 issued under that certain indenture dated August 14, 2012 between EFIH and CSC Trust, as successor indenture trustee (the "6.875% Indenture").  Although CSC Trust has not been directed by a majority of holders of the 6.875% notes, the First Lien Indenture and the 6.875% Indenture are substantively identical with respect to the issues raised by this Complaint (except for the amount of the First Lien Redemption Premium).

1

EFIH (as defined below) under the Indenture dated as of August 17, 2010 (together with all supplements, amendments, and exhibits, the "First Lien Indenture," copies of which are attached hereto as Exhibit A) between Energy Future Intermediate Holding Company LLC ("EFIH LLC"), EFIH Finance Inc. ("EFIH Finance," and together with EFIH LLC, "EFIH" or the "EFIH Debtors"), and the First Lien Indenture Trustee and (ii) as Collateral Trustee under the Collateral Trust Agreement dated as of November 16, 2009 (including joinders thereto, the "Collateral Trust Agreement," a copy of which is attached hereto as Exhibit B), in each capacity as successor to The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon"), by its undersigned counsel, hereby alleges for its Complaint against (a) Defendants Computershare Trust Company of Canada ("Computershare Canada") and Computershare Trust Company, N.A. ("Computershare N.A.," and collectively with Computershare Canada, Computershare"), as successor indenture trustee to BNY Mellon (the "Second Lien Indenture Trustee") for the notes ("Second Lien Notes") issued under the Indenture dated as of April 25, 2011 (together with all supplements, amendments, and exhibits, the "Second Lien Indenture," a copy of which is attached hereto as Exhibit C), (b)  Defendant Epiq Systems, Inc. ("Epiq"), as the "Depositary Agent" for holders of beneficial interests in the Second Lien Notes ("Second Lien Holders") under the Offer to Purchase for Cash Any and All Outstanding EFIH Second Lien Notes, dated as of May 9, 2014 (as amended and supplemented from time to time, the "Tender Offer," a copy of which is attached hereto as Exhibit D, (D.I. 400, 555, 612, 883), (c) Defendant The Depository Trust Company ("DTC"), as a holder of Second Lien Notes and an agent for Second Lien Holders, and (d) Cede & Co. ("Cede") as

nominee of DTC for holding of Second Lien Notes, and upon knowledge of its own acts and upon information and belief as to all matters, as follows:

### NATURE OF ACTION

2.      In this action, CSC Trust seeks to enforce an intercreditor agreement to prevent proceeds of First Lien Notes collateral from being used to make payments to holders of subordinated Second Lien Notes prior to payment in full in cash of all obligations under the First Lien Indenture related to the First Lien Notes (collectively, "First Lien Obligations").

3.      The First Lien Indenture Trustee and Collateral Trustee seek to preclude the currently proposed payment of junior obligations by the EFIH Debtors, absent recognition and relief in respect of the First Lien Holders' contractual right to payment in full from such funds of approximately $432.4 million of obligations currently owed to them.  To the extent such payments are made to the Second Lien Indenture Trustee or Second Lien Holders in violation of the applicable agreements, as currently proposed, this Complaint seeks specific performance, turnover, or (alternatively) damages of not less than $432.4 million from the parties unlawfully receiving such payments.  Under the Collateral Trust Agreement, which governs the relationship between the First Lien Notes and Second Lien Notes, the Second Lien Trustee and Second Lien Holders owe such amounts regardless of whether allowable or enforceable in this chapter 11 case.

4.      The Collateral Trust Agreement requires that any Second Lien Notes representative such as Computershare (as Second Lien Indenture Trustee), or any holder of Second Lien Notes such as Epiq (as transferee and/or as agent for Second Lien

Holders) or DTC and Cede (as a Second Lien Holder and agent for Second Lien

Holders), must remit "proceeds of Collateral" that they receive, including proceeds of any

financing falling within the contractual definition of a "Sale" (which includes secured

financings) of Collateral (collectively, "Collateral Proceeds"), to CSC Trust until

discharge of all First Lien Obligations.  *See* Collateral Trust Agreement §§ 2.4(c), (d),

3.4(a).

5.      The EFIH Debtors have undertaken a transaction that would, and filed

submissions proposing to, violate these intercreditor agreement requirements by paying

Collateral Proceeds consisting of (i) proceeds of loans advanced under the First Lien

Priming DIP Facility, (ii) proceeds of loans advanced under the Second Lien DIP

Facility, and (iii) cash collateral to (a) DTC in respect of the Second Lien Refinancing,

and (b) Epiq and DTC in respect of Second Lien Settlement payments pursuant to the

Tender Offers, all without paying Outstanding First Lien Obligations.

6.      The Collateral Trust Agreement requires remittance of any payments from

proceeds of Collateral of the First Lien Notes to CSC Trust until payment in full of all

Outstanding First Lien Obligations, whether or not such obligations are allowed or

enforceable against the Debtors under the Bankruptcy Code.  The requirements of the

Collateral Trust Agreement are independent of the obligations of the EFIH Debtors under

the First Lien Indenture and apply both before and after the filing of EFIH's bankruptcy

case.

7.      Even if the First Lien Priming DIP Facility and Second Lien DIP Facility

are permitted under the Bankruptcy Code, the Collateral Trust Agreement still provides

that Collateral Proceeds obtained through such financings cannot be paid to Second Lien Holders before all First Lien Obligations are paid in full.  EFIH's bankruptcy filing and any approval of the DIP Financings do not allow the Second Lien Holders and Second Lien Indenture Trustee to elevate their priority by obtaining payment, including payment of the Second Lien Redemption Premium, whether in settlement or otherwise, from these funds.

8.    The redemption premium under the First Lien Notes (the "First Lien Redemption Premium") has been irrevocably due since the EFIH Debtors effected an optional redemption of the First Lien Notes on June 19, 2014 or equivalent transactions giving rise to a claim.  Claims relating to the First Lien Redemption Premium of not less than $430.8 million are due to First Lien Holders who were not offered or who did not accept a post-petition tender offer by the EFIH Debtors (the "First Lien Settlement").  Additional Outstanding First Lien Obligations are also due on account of additional accruing interest on the interest due on the First Lien Notes, First Lien Indenture Trustee fees, and reimbursement for professional fees of the First Lien Indenture Trustee.

9.    The EFIH Debtors and Second Lien Holders are bound by the Collateral Trust Agreement.  Thus, they cannot evade the result mandated by that agreement merely by structuring Second Lien Settlement and Second Lien Refinancing payments to circumvent the mandate of payment to the Collateral Trustee.[2]

---

[2] The First Lien Indenture Trustee and Collateral Trustee reserve rights in the event that Second Lien Holders replace or supplement the current PIK Noteholders as lenders in a second lien debtor-in-possession financing facility, and all other rights against Second Lien Holders not named herein under the Collateral Trust Agreement and other applicable documents.

10.     The Second Lien Indenture requires that the Second Lien Refinancing be effected through payments to Computershare, on behalf of Second Lien Holders, for distribution to such holders.[3]  Computershare, as Second Lien Indenture Trustee, is party to the Collateral Trust Agreement and is bound by its terms.

11.     Epiq, as Depositary Agent under the Tender Offer, is also bound by the Collateral Trust Agreement because each Settling Second Lien Holder appointed Epiq as the "true and lawful agent and attorney-in-fact" and/or because the tender procedures include a transfer of the notes to Epiq.  The Letter of Transmittal agreed to by such tendering holders provides for the delivery of Second Lien Notes to Epiq and grants Epiq an "irrevocable power coupled with an interest" to transfer the Second Lien Notes and to receive payment as agent for Settling Second Lien Holders.

12.     DTC is bound under the Collateral Trust Agreement both as a holder of Second Lien Notes itself, and in its proposed capacity as an agent receiving the Second Lien Refinancing payments "for the benefit of" Non-Settling Second Lien Holders, for distribution to such holders, as provided in the EFIH Debtors' proposed final order approving the Second Lien DIP Financing and Second Lien Refinancing payments (the "Proposed Second Lien DIP Order").[4]  Cede is similarly bound under the Collateral Trust

---

[3] In fact, the Collateral Trust Agreement requirement to route payments through the Collateral Trustee may supersede the Second Lien Indenture requirement.  In either event the funds are subject to the Collateral Trust Agreement.

[4] Proposed Final Order (A) Approving Postpetition Second Lien Financing, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Authorizing the Use of Cash Collateral, (D) Authorizing the EFIH Second Lien Repayment, (E) Authorizing Entry into and Payment of Fees Under the Commitment Letter, and (F) Modifying the Automatic Stay ¶13 [D.I. 994, Exhibit A].

Agreement in its capacity as DTC's nominee for registration and holding the Second Lien Notes.

13.     This Complaint therefore seeks specific performance of the Collateral Trust Agreement, and enforcement of the trust created thereby, to require that, upon receiving payments as and on behalf of Second Lien Holders, Computershare, Epiq, DTC, and Cede must (i) immediately, jointly and severally, remit an amount of not less than $432.4 million of those Second Lien Payments to CSC Trust for application to satisfy the First Lien Redemption Premium and all other Outstanding First Lien Obligations (whether or not the allowance of such Obligations as claims in the Bankruptcy Case is disputed), and (ii) each hold in trust and reserve amounts for payment of all Anticipated First Lien Notes Obligations before making any further payments or transfers, including payments to Second Lien Holders in respect of the Second Lien Refinancing and Second Lien Settlement.

14.     The Second Lien Indenture Trustee has filed an adversary proceeding seeking judgment that a redemption premium is due under the Second Lien Notes (the "Second Lien Redemption Premium"), which premium is substantively identical in relevant part to the First Lien Indenture Premium.  Complaint for Declaratory Relief [Adv. Proc. 14-50405; D.I. 1] (the "Second Lien Redemption Premium Complaint").  As a result, the Second Lien Indenture Trustee is estopped from contesting that the First Lien Redemption Premium is due.

15.     To the extent that Computershare, Epiq, DTC, or Cede fails to hold Collateral Proceeds in trust and to remit Collateral Proceeds to CSC Trust, or this Court

determines not to grant an injunction, CSC Trust seeks a judgment against Computershare, Epiq, DTC, and Cede, as applicable, for breach of contract and conversion.

## JURISDICTION AND VENUE

16.     Jurisdiction exists over this adversary proceeding pursuant to 28 U.S.C. § 157 and both (i) 28 U.S.C. § 1334 because it arises under the Bankruptcy Code and it arises in the chapter 11 cases of EFIH LLC and EFIH Finance pending in the United States Bankruptcy Court for the District of Delaware, jointly administered under the case of *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) and (ii) 28 U.S.C. § 1332 because there exists diversity among the parties and the matter in controversy exceeds $75,000.

17.     The predicates for relief are sections 105(a) and 510(a) of Chapter 11, title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), 28 U.S.C. § 2201, and common law and equity.

18.     The claims for relief herein are core matters under 28 U.S.C. § 157(b)(2). The First Lien Indenture Trustee and the Collateral Trustee hereby consent to entry of final orders by the Bankruptcy Court with respect to the relief requested in this Complaint.  However, the First Lien Indenture Trustee and the Collateral Trustee do not consent to the entry of final orders by the Bankruptcy Court to the extent that any party asserts counterclaims, cross-claims, or third-party claims against the First Lien Indenture Trustee and Collateral Trustee.

19.    Venue of this Adversary Proceeding in this district is proper pursuant to 28 U.S.C. § 1409 because (i) the above-captioned chapter 11 case to which this case is related is pending in this District before this Court, and (ii) none of the exceptions set forth in 28 U.S.C. § 1409 apply to this action.

## PARTIES

20.    Plaintiff CSC Trust is a Delaware state chartered trust company having its principal place of business in Wilmington, Delaware.  CSC Trust is the indenture trustee under the First Lien Indenture.  CSC Trust is also the Collateral Trustee under the Collateral Trust Agreement.

21.    Defendant Computershare Canada is a trust company chartered under the laws of Canada having its principal place of business in Toronto, Ontario, Canada. Defendant Computershare N.A. is a federally chartered trust company under the laws of the United States having its principal office and place of business in Canton, Massachusetts.  Computershare Canada and Computershare N.A., collectively, is the indenture trustee under the Second Lien Indenture.

22.    Defendant Epiq is a Missouri corporation having its principal office and place of business in Kansas City, Kansas.  Epiq is the Depositary Agent and is constituted as attorney-in-fact for Settling Second Lien Holders under the Tender Offer, and alternatively receives and becomes a holder of such Second Lien Notes pursuant to the tender procedures.

23.    Defendant DTC is a limited-purpose trust company organized under the New York Banking Law having its principal office and place of business in New York,

9

New York.  DTC is a holder of Second Lien Notes and the proposed agent for Non-Settling Second Lien Holders to receive Second Lien Refinancing payments under the Proposed Second Lien DIP Order.

24.     Defendant Cede is a limited-purpose trust company organized under New York banking law, having its principal office and place of business in New York, New York.  Cede is an affiliate of DTC and is the nominee of DTC for registration, and holder of, the Second Lien Notes.

## FACTS

25.     On April 29, 2014 (the "Petition Date"), the EFIH Debtors filed voluntary petitions for relief under the Bankruptcy Code.  The chapter 11 cases of EFIH LLC and EFIH Finance (together, the "Chapter 11 Cases") remain pending in the United States Bankruptcy Court for the District of Delaware.

## I.     THE DIP FINANCINGS AND SECOND LIEN PAYMENTS

### A.     First Lien DIP Motion

26.     On the Petition Date, the EFIH Debtors filed a motion (the "First Lien DIP Motion") seeking entry of an order, among other things, (i) approving a $5.4 billion superpriority postpetition priming first lien debtor-in-possession financing (the "First Lien Priming DIP Facility"), (ii) granting priming first-priority liens on all prepetition and postpetition property of the EFIH Debtors (the "Priming First Lien DIP Liens"), and (iii) authorizing the EFIH Debtors to use the First Lien Priming DIP Facility to redeem the First Lien Notes (the "First Lien Refinancing").  First Lien DIP Motion ¶ 13 [D.I. 74]. The property granted as collateral includes 80% of the equity of Oncor Electric Delivery

Holdings Company LLC ("Oncor Holdings") and proceeds thereof, which was property of EFIH prior to the time of issuance of the First Lien Notes.

27. In the First Lien DIP Motion, the EFIH Debtors recognized that the Collateral Trust Agreement is binding on CSC Trust, as First Lien Indenture Trustee and Collateral Trustee, and Computershare, as Second Lien Indenture Trustee, and that it governs the relative priority of the First Lien Notes and Second Lien Notes and the relative rights and remedies of the First Lien Holders and Second Lien Holders with respect to, among other things, debtor-in-possession financing and use of EFIH cash collateral. First Lien DIP Motion ¶ 35. The First Lien DIP Motion also recognized that "any payments to the [Second Lien Holders] before the [] First Lien Notes are refinanced will be subject to turnover to the [First Lien Holders] pursuant to the terms of the [] Collateral Trust Agreement." *Id.*

B.      Settlement Motion

28. On May 15, 2014, the EFIH Debtors filed a motion (the "Settlement Motion") seeking, among other things, approval of a settlement providing for the redemption of outstanding principal and accrued but unpaid interest and payments on account of Second Lien Redemption Premium claims (collectively, the "Second Lien Settlement," and together with the Second Lien Refinancing, the "Second Lien Payments") with certain specified Second Lien Holders and all other Second Lien Holders that elect to participate in such settlement (collectively, the "Settling Second Lien Holders"). Settlement Motion ¶ 30 [D.I. 472]. The Second Lien Settlement includes all payments proposed to be made to Second Lien Holders under the Second

Lien Settlement Motion, including payments to the Second Lien RSA Parties (as defined in the Settlement Motion).  The Settlement Motion proposes that Second Lien Holders may elect to participate in the Second Lien Settlement by tendering their debt pursuant to the Tender Offer.  The EFIH Debtors disclosed that, as of June 11, 2014, holders of the principal amount of approximately $922.5 million of Second Lien Notes had agreed to participate in the Second Lien Settlement.  Form 8-K filed by Energy Future Holdings Corp., June 13, 2014, a copy of which is attached hereto as Exhibit E.

       C.       Second Lien DIP Motion

       29.      Also on May 15, 2014, the EFIH Debtors filed a motion (the "Second Lien DIP Motion") seeking entry of an order, among other things, (i) approving a $1.9 billion second lien DIP financing (the "Second Lien DIP Facility," and together with the First Lien Priming DIP Facility, the "DIP Financings"), (ii) granting junior liens on the collateral securing the First Lien Notes and other assets to secure the proposed Second Lien DIP Facility (the "Second Lien DIP Liens" and together with the First Lien Priming DIP Facility Liens, the "DIP Financing Liens"), and (iii) authorizing redemption of the outstanding principal and accrued but unpaid interest (the "Second Lien Refinancing") on Second Lien Notes that are not tendered pursuant to the proposed Second Lien Settlement (but excluding any payments for Second Lien Notes redemption premium claims). Second Lien DIP Motion ¶ 16 [D.I. 477].  The property granted as collateral includes the equity of Oncor Holdings and proceeds thereof, which was property of EFIH prior to the time of issuance of the First Lien Notes.

D.    Sources of Funds for Second Lien Payments

30.    The EFIH Debtors have proposed that both the Second Lien Refinancing and the Second Lien Settlement payments will be made using the proceeds of the First Lien Priming DIP Facility, the Second Lien DIP Facility, and other cash on hand. Second Lien DIP Motion ¶ 5; Proposed Second Lien DIP Order ¶ 13; Tender Offer, at 24 ("Sources of Funds").  Upon information and belief, prior to closing of the First Lien Priming DIP Facility, the EFIH Debtors have been funding operations during their Chapter 11 Cases with cash on hand, most of which consists of dividends of stock of Oncor Holdings, which was pledged as collateral for the First Lien Obligations ("Cash Collateral").  Accordingly, a least a portion of the EFIH Debtors' current cash on hand that they propose to use to fund Second Lien Payments is also Cash Collateral.

31.    Taken together, these proposed transactions grant First Lien Priming DIP Liens senior to the liens securing the First Lien Notes and using proceeds of that loan together with other Collateral Proceeds to make substantial Second Lien Payments, before repaying in cash disputed and undisputed obligations outstanding under the First Lien Indenture.

## II.    FIRST LIEN REDEMPTION PREMIUM AND SUBSTANTIAL UNDISPUTED FIRST LIEN OBLIGATIONS REMAIN DUE AND OWING

A.    Redemption Premium Action

32.    On May 15, 2014, the First Lien Indenture Trustee filed a Complaint for Declaratory Relief (the "Redemption Premium Action") seeking a declaration that EFIH is obligated to pay the First Lien Redemption Premium in connection with the proposed First Lien Refinancing.  Compl. for Declaratory Relief, May 15, 2014 [Adv. Proc. No.

14-50363; D.I. 1].  The Redemption Premium Action sought a premium of approximately $665.2 million with respect to all holders of First Lien Notes.  The amount of the First Lien Redemption Premium due on the date of the First Lien Refinancing, after giving effect to the First Lien Settlement, is approximately $430.8 million.[5]  The combined hearing and trial concerning the Redemption Premium Action is currently scheduled to commence September 10, 2014.

> B.    Other Outstanding First Lien Obligations

33.    In addition to the First Lien Redemption Premium, as of the date of the First Lien Refinancing, EFIH was also obligated to pay additional amounts to the First Lien Indenture Trustee in respect of the First Lien Notes (collectively with the First Lien Redemption Premium, the "Outstanding First Lien Obligations"), including the following:

i.    Approximately $1.7 million of pre- and post-petition interest (including Additional Interest under that certain Registration Rights Agreement dated as of January 29, 2013) that remains accrued and unpaid as of June 19, 2014 ("Unpaid Interest");

ii.    Trustee fees under the terms of the First Lien Indenture, and any subsequent trustee fees accruing ("Unpaid Trustee Fees"); and

iii.    Reimbursement for compensation of, and expenses paid by, the First Lien Indenture Trustee, including fees and expenses of its counsel, under section

---

[5] Depending on the outcome of the appeal of the order approving the First Lien Settlement and the precise appellate relief sought and granted, the aggregate First Lien Redemption Premium obligations could be approximately $653.3 million.

7.07 of the First Lien Indenture, and any subsequent professional compensation accruing ("Unpaid Trustee Professional Reimbursement").

C.    First Lien DIP Order

34.    On June 6, 2014, the Bankruptcy Court entered an order approving the First Lien Priming DIP Facility (the "First Lien DIP Order"). On or about June 19, 2014, the First Lien Priming DIP Facility closed and was funded.

D.    Substantial First Lien Obligations Remain Outstanding

35.    Upon the closing of the First Lien Priming DIP Facility, EFIH consummated the First Lien Refinancing by redeeming outstanding principal and a portion of the outstanding interest under the First Lien Notes. EFIH did not, however, pay the First Lien Redemption Premium or other Outstanding First Lien Obligations listed above in paragraph 33. Accordingly, amounts due on account of the Outstanding First Lien Obligations continue to accrue interest. The First Lien DIP Order preserved the rights of all parties in the Chapter 11 Cases with respect to such outstanding obligations. First Lien DIP Order ¶ 12 [D.I. 859].

III.    **ADDITIONAL SUBSEQUENT AMOUNTS WILL CONTINUE TO ACCRUE UNDER THE FIRST LIEN NOTES**

36.    The following subsequent obligations will also continue to accrue under the First Lien Notes after the Second Lien Payments are made, until such time as all Outstanding First Lien Obligations are paid to First Lien Holders ("Subsequently Accruing First Lien Obligations"):

       i.    Interest on the First Lien Redemption Premium;

      ii.    Additional accrued Unpaid Interest;

       iii.      Additional accrued Unpaid Trustee Fees;

       iv.      Additional amounts due on account of additional accrued Unpaid

Trustee Professional Reimbursement;

       v.      Any indemnification obligations that become due to the First Lien

Indenture Trustee; and

       vi.      Accrued interest on the foregoing amounts listed in i.-v. of this

paragraph.

## IV.   SECOND LIEN PAYMENTS WILL BE EFFECTED THROUGH PAYMENTS TO COMPUTERSHARE, EPIQ, DTC AND/OR CEDE

    A.   <u>Second Lien Refinancing Through DTC or Computershare for Non-Settling Second Lien Holders</u>

    37.    The Second Lien Refinancing of Second Lien Holders that do not

participate in the Second Lien Settlement ("<u>Non-Settling Second Lien Holders</u>") will be

effected by EFIH paying money to one or more of Computershare, DTC, and Cede. The

Proposed Second Lien DIP Order proposes that the EFIH Debtors will consummate the

Second Lien Refinancing by paying the applicable proceeds of the Second Lien DIP

Facility to DTC "for the benefit of the [Non-Settling Second Lien Holders], and as

promptly as practicable thereafter and without undue delay, the Depository Trust

Company shall repay the Second Lien Notes held by the [Non-Settling Second Lien

Holders]." Proposed Second Lien DIP Facility ¶13.

    38.    The Second Lien Indenture, however, provides that repayments to, and

redemption of, Second Lien Holders of amounts outstanding under the Second Lien

Indenture are to be effected through Computershare acting as "Paying Agent" under the

Second Lien Indenture.  Second Lien Indenture §§ 2.03, 2.04, 3.05.

> B.    Second Lien Settlement Payments Through Epiq and DTC for Settling
>       Second Lien Holders

39.    The terms of the Tender Offer provide that Settling Second Lien Holders

must validly surrender their Second Lien Notes to Epiq, as "Depositary Agent," through a

book-entry transfer:

> *Book-Entry Delivery of the EFIH Second Lien Notes;*
> *Tender through ATOP. . . .* DTC participants may
> electronically transmit their acceptance of the Offer by
> causing DTC to transfer their outstanding EFIH Second
> Lien Notes *to the Depositary Agent* using the ATOP
> procedures.  In connection with each book-entry *transfer of*
> *EFIH Second Lien Notes to the Depositary Agent*, DTC
> will send an agent's message (the "Agent's Message") to
> the Depositary Agent, which, in turn, *will confirm its*
> *receipt of the book-entry transfer* (a "Book-Entry
> Confirmation").  The Agent's Message is transmitted by
> DTC to, and received by, the Depositary Agent and forms a
> part of the Book-Entry Confirmation, stating that DTC has
> received an express acknowledgement from the participant
> in DTC tendering EFIH Second Lien Notes that such
> participant has received and agrees to be bound by the
> terms of the Offer and that it may enforce such agreement
> against the participant.

Tender Offer, at 26-27 "Procedures for Tendering EFIH Second Lien Notes."  (emphases

added).  In tendering Second Lien Notes, each such holder:

> *irrevocably constitutes and appoints the Depositary Agent*
> *as the true and lawful agent and attorney-in-fact of such*
> *Holder* . . . with respect to any such tendered EFIH Second
> Lien Notes, with full power of substitution and
> resubstitution (*such power of attorney being deemed to be*
> *an irrevocable power coupled with an interest*) to (a)
> transfer ownership of such EFIH Second Lien Notes on the
> account books maintained by DTC, together with all

> accompanying evidences of transfer and authenticity, to the
> Company, (b) present such EFIH Second Lien Notes for
> transfer on the relevant security register and (c) *receive all
> benefits or otherwise exercise all rights of beneficial
> ownership of such EFIH Second Lien Notes (except that the
> Depositary Agent will have no rights to, or control over,
> funds from the Company, except as agent for the tendering
> Holders, for the Total Consideration or Tender
> Consideration, as applicable, for any tendered EFIH
> Second Lien Notes that are purchased by the Company).*

*Id*. at 27-28 (emphasis added).  The tender is effectuated under these procedures through the DTC and Cede book-entry system.

40.     This Complaint arises because, absent payment or provisions for payment of all First Lien Obligations to CSC Trust, the proposed payment of the Second Lien Payments to Computershare, Epiq, DTC, and/or Cede will violate the Collateral Trust Agreement.

## V.     THE COLLATERAL TRUST AGREEMENT PROHIBITS SECOND LIEN HOLDERS FROM RETAINING PAYMENTS FROM PROCEEDS OF THE DIP FINANCINGS UNLESS THE FIRST LIEN REDEMPTION PREMIUM AND OTHER OUTSTANDING FIRST LIEN OBLIGATIONS OWED TO THE FIRST LIEN HOLDERS AND FIRST LIEN INDENTURE TRUSTEE ARE PAID IN FULL IN CASH

41.     Section 2.4(c) of the Collateral Trust Agreement contains two separate prohibitions on payments to the Second Lien Indenture Trustee or Second Lien Holders (together, the "Second Lien Payment Restrictions").  Each of these Second Lien Payment Restrictions is in effect any time before discharge of the First Lien Obligations.  Further, recipients of payments are required to hold such payments in trust for the holders of First Lien Notes (the "First Lien Holders") and remit those payments to the First Lien Indenture Trustee upon demand until all First Lien Obligations are discharged.

42.     One of the Second Lien Payment Restriction prohibitions is generally applicable at any time, whether before or after commencement of the Chapter 11 Cases (the "Second Lien Payment Restriction"); the other prohibition applies only after the commencement of a bankruptcy or certain default and remedy actions (the "Insolvency Second Lien Payment Restriction").

43.     Section A below explains why the proposed Second Lien Payments violate the General Second Lien Payment Restriction.  Section B below explains why the proposed Second Lien Payments violate the Insolvency Second Lien Payment Restriction.  Section C below explains why the proposed Second Lien Payments made from Cash Collateral violate both Second Lien Payment Restrictions.

A.     The DIP Financing Proceeds Constitute "Proceeds Resulting from a Sale of Collateral" Under the General Second Lien Payment Restriction

44.     The General Second Lien Payment Restriction provides, in relevant part:

> at any time prior to the Discharge of Parity Lien Obligations, no payment shall be made to … any Junior Lien Representative or any holder of Junior Lien Obligations with respect to Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations) (i) *from the proceeds resulting from a Sale of Collateral . . . .*

Collateral Trust Agreement § 2.4(c)(i) (emphasis added).  Under the defined terms used in the Collateral Trust Agreement, the Second Lien Indenture Trustee is a "Junior Lien Representative" and all Second Lien Holders are "holders of Junior Lien Obligations." *Id.* at § 1.1.  Accordingly, any proceeds resulting from a Sale of Collateral must be applied first to effect a "Discharge of Parity Lien Obligations" before Second Lien Holders may receive any payments from those amounts.

19

45.    The Collateral Trust Agreement defines "Sale of Collateral" as "any Asset Sale involving a sale or other disposition of Collateral."  The term "Asset Sale" is defined in the Collateral Trust Agreement by incorporation of the definition from the Indenture dated as of November 16, 2009 between EFIH and BNY Mellon (the "Reference Indenture," a copy of which is attached as Exhibit F).  *See id.*

46.    The term "Asset Sale" is defined broadly in section 1.01 of the Reference Indenture to include "dispositions" and "transfers," and explicitly includes financing transactions.  The definition provides that an "Asset Sale" includes:

> the sale, conveyance, *transfer* or other disposition (each referred to in this definition as a "disposition") . . . of property or assets (*including by way of a Sale and Lease-Back Transaction*) of EFIH or any of its Restricted Subsidiaries.

Reference Indenture § 1.01 "Asset Sale" (emphasis added).  In this case, the term "Asset Sale" clearly refers to financing transactions, because sale lease-back transactions (which are simply a form of off-balance sheet financings) are specifically included.  Further, the term "transfer" as used in the Uniform Commercial Code includes the grant of a security interest.  *See* U.C.C. § 9-102, Official Comment 26 (2014) (noting that the term "transfer" may refer to "transfer of a limited interest, such as a security interest").

47.    If there was any doubt that the term "Sale of Collateral" includes financing transactions, it is put to rest by the enumerated exclusions from the definition of "Asset Sale," which carve out twenty-three enumerated categories of transactions.  Excluded from the "Asset Sale" definition in the Reference Indenture, in subsection (k) of section 1.01, is: "any financing transaction with respect to property built or acquired by EFIH or

any Restricted Subsidiary *after the Issue Date*." Reference Indenture § 1.01 "Asset Sale" (emphasis added).

48.     Taken together, the broad definition of "Asset Sale" that includes "transfers" in connection with financing transactions and the exclusion of specific financing transactions permitted under the Reference Indenture lead to the inescapable conclusion that the term "Asset Sale" must include financing transactions granting liens on property that EFIH acquired *on or before* the first issuance under the Reference Indenture. First, the "Asset Sale" definition above expressly includes Sale and Lease-Back Transactions for a purpose. Even though the preceding terms "transfer" and "disposition" already encompass an extremely broad range of transactions, the express inclusion of Sale and Lease-Back Transactions makes clear that the term "dispositions" includes transactions similar to Sale and Lease-Back Transactions, *i.e.*, financing transactions that generate proceeds for EFIH by encumbering or removing property from the Reference Indenture's collateral package- just like the First Lien Priming DIP Facility. In addition, the Second Lien DIP Facility, if approved, will generate proceeds for EFIH by granting liens on collateral securing the First Lien Notes. Accordingly, the First Lien Priming DIP Facility and the Second Lien DIP Facility financings each constitute an "Asset Sale" as defined in the Collateral Trust Agreement, and proceeds of those DIP Financings therefore constitute proceeds of a Sale of Collateral under section 2.4(c) of the Collateral Trust Agreement.

49.     Second, the exception in section 1.01(k) of the Reference Indenture confirms that financings are "Asset Sales" if secured by property EFIH owned on or

before the first issuance under the Reference Indenture.  Specifically, subsection (k)

limits its exception only to financing transactions with respect to "property built or

acquired by EFIH or any Restricted Subsidiary *after the Issue Date*, including Sale and

Lease-Back Transactions and asset securitizations permitted by this Indenture."  *Id.*  This

limitation to after-acquired property means that financing transactions with respect to

property built or acquired by EFIH *on or before* the Issue Date are to be included within

the "Asset Sale" definition.   To interpret the agreement otherwise would render the after-

acquired property exclusion in subsection (k) meaningless.  The principal collateral for

these financings is the equity of Oncor Holdings, which EFIH acquired on or prior to the

Issue Date under the Reference Indenture.

50.    Because the DIP Financings constitute "Sales of Collateral," as defined in

section 2.4(c), the Second Lien Payments are to be made from the "proceeds of" such

"Sales of Collateral," in violation of the General Second Lien Payment Restriction.

B.    The DIP Financing Proceeds Constitute "Proceeds of Collateral" Under
the Insolvency Second Lien Payment Restriction

51.    In addition, the Insolvency Second Lien Payment Restriction provides:

> At any time prior to the Discharge of Parity Lien
> Obligations and after (1) the commencement of any
> Insolvency or Liquidation Proceeding in respect of EFIH
> . . . no payment of money (or the equivalent of money)
> shall be made *from the proceeds of Collateral* by EFIH to .
> . . any Junior Lien Representative or any holder of Junior
> Lien Obligations with respect to Junior Lien Obligations
> (including, without limitation, payments and prepayments
> made for application to Junior Lien Obligations).

Collateral Trust Agreement § 2.4(c) (emphasis added).  As set forth above, the Second

Lien Indenture Trustee is a "Junior Lien Representative" and holders of the Second Lien

Notes are "holders of Junior Lien Obligations."  Accordingly, any proceeds of Collateral must be applied first to effect a "Discharge of Parity Lien Obligations" before Second Lien Holders may receive any payments from those amounts.

52.     The EFIH Debtors have taken the position that "the proceeds of *new debt* are not proceeds of collateral, even if the new debt is secured by a lien on collateral." EFIH Debtors' Omnibus Reply to Objections to the First Lien DIP Motion ¶ 24 [D.I. 735] (emphasis in original).

53.     The Collateral Trust Agreement, however, defines "Collateral" broadly to include assets or property pledged or assigned under the First Lien Notes or Second Lien Notes security documents "together with the *proceeds* thereof."  Collateral Trust Agreement § 1.1.  And the EFIH Debtors' narrow interpretation of "proceeds" is clearly at odds with reality and the multiple instances in the Collateral Trust Agreement cited above where financings are encompassed within the term "proceeds."

54.     Notably, the Insolvency Second Lien Payment Restriction applies only after an insolvency (or other specified event), while the General Second Lien Payment Restriction applies at any time.  Accordingly, it is proper to read "proceeds of Collateral" as encompassing a broader range of assets than "proceeds of a Sale of Collateral," otherwise the Insolvency Second Lien Payment Restriction would not restrict any payments that are not already restricted by the General Second Lien Payment Restriction. Because proceeds of the DIP Financings constitute "proceeds of a Sale of Collateral" under the General Second Lien Payment Restriction, *a fortiori*, those proceeds constitute "proceeds of Collateral" under the Insolvency Second Lien Payment Restriction.

55.     While the introductory phrase "proceeds of" is not defined directly in the Collateral Trust Agreement, section 1.2(a) provides that terms used and not otherwise defined in the Collateral Trust Agreement have the meaning provided in Article 9 of the UCC.  The applicable UCC definition of "proceeds" includes:  "[w]hatever is acquired upon the sale, lease, license, or other disposition of collateral" and also "rights arising out of collateral."  U.C.C. § 9-102(a)(64)(A),(C) (McKinney 2001).  Cash advanced as a loan under the DIP Financings therefore constitutes "proceeds" resulting from the collateral of the First Lien Notes for at least two reasons:  (i) the loan advances are cash "acquired upon . . . disposition of collateral" because the grant of liens to obtain proceeds of the DIP Financings are dispositions of Collateral, and (ii) the proceeds of the DIP Financing loans are "rights arising out of collateral" because the liens securing the DIP Financings were conditions for the advance of the DIP Financing loans.  The definition of "proceeds" in the UCC is to be interpreted to cover expanding commercial practices, UCC § 1-102(1), (2), and to take into account the law of bankruptcy, UCC § 1-103.

56.     Further, as noted above, the Reference Indenture definition of Asset Sales, expressly incorporated into the Collateral Trust Agreement, clarifies the breadth of the term "disposition," using the UCC proceeds definition by defining "disposition" to include "sale[s], conveyance[s], transfer[s], or disposition[s]."  Reference Indenture § 1.01 "Asset Sale."

57.     Thus, loans advanced under the DIP Financings are subject to the Second Lien Payment Restrictions under the Collateral Trust Agreement.

C.    <u>All Funds to be Used for the Second Lien Payments Are Proceeds of</u>
<u>Collateral</u>

58.    As described above, the EFIH Debtors have proposed using money from

the DIP Financings that constitutes both "proceeds of Collateral" and "proceeds of a Sale

of Collateral" as a source for Second Lien Payments.  Additionally, the EFIH Debtors

have Cash Collateral on hand derived from the Oncor dividends.  As a result, all cash

proposed to be used for Second Lien Payments constitutes Collateral and proceeds of

Collateral.

D.    <u>"Discharge of Parity Lien Obligations" Has Not Occurred and Will Not</u>
<u>Occur Until First Lien Redemption Payments and Other Outstanding First</u>
<u>Lien Obligations Are Paid in Cash to the First Lien Holders, First Lien</u>
<u>Indenture Trustee and the Collateral Agent</u>

59.    "Discharge of Parity Lien Obligations" under the Collateral Trust

Agreement occurs only upon the (i) "payment in full in cash of the principal of, and

interest *and premium*, if any, on all Parity Lien Debt," <u>and</u> (ii) "payment in full of all

other Parity Lien Obligations that are outstanding and unpaid at the time the Parity Lien

Debt is paid in full in cash."  Collateral Trust Agreement § 1.1 "Discharge of Parity Lien

Debt" (emphasis added).  The term "Parity Lien Debt" in the Collateral Trust Agreement

includes the First Lien Notes. *Id*.

60.    These provisions establish that the obligations that must be satisfied by a

turnover from Second Lien Payments are broader than those obligations that may be

enforced against the EFIH Debtors.  That is, Second Lien Holders' obligations are <u>not</u>

coextensive with the EFIH Debtors' obligations—it is no defense to turnover for the

Second Lien Holders that part or all of the First Lien Obligations are disallowed as

against the EFIH Debtors or other defense based upon the EFIH Debtors' bankruptcy. For example, the definition of "Discharge of Parity Lien Obligations" requires funding of amounts that are unmatured, contingent, or even unenforceable against the borrower.  *See* Collateral Trust Agreement § 1.1 "Discharge of Parity Lien Obligations;" "Obligations."

61.     The First Lien Redemption Premium is owed to the First Lien Indenture Trustee, and, therefore, a "Discharge of Parity Lien Obligations" cannot occur until the Redemption Premium is paid in cash to the First Lien Indenture Trustee.

62.     The Collateral Trust Agreement defines the "Parity Lien Obligations" that must also be paid in order to effect a Discharge of Parity Lien Obligations as "the Parity Lien Debt and all other Obligations in respect of the Parity Lien Debt."  The relevant "Obligations" include:

> any principal, interest (including all interest accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the Secured Debt Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding), premium, . . . and other liabilities, *payable under the documentation governing any Indebtedness.*

Collateral Trust Agreement § 1.1 "Parity Lien Obligations," "Obligations" (emphases added).[6]

---

[6] The "Rules of Interpretation" in the Collateral Trust Agreement provide that:

> The use in this Agreement . . . of the word "include" or "including," when following any general statement, term or matter, will not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but will be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

Collateral Trust Agreement § 1.2(c).

63.    "Discharge of the Parity Lien Obligations" under the Collateral Trust

Agreement therefore has not yet occurred, and it will not have occurred by the anticipated

date of the proposed Second Lien Payments unless the Redemption Premium and all of

the First Lien Obligations due on that date have been paid to the First Lien Indenture

Trustee.

    E.    <u>Computershare, Epiq, DTC, and Cede Are Required (i) to Remit to the Indenture Trustee for Application to the Redemption Premium, and (ii) to Reserve Amounts from the Second Lien Payments to Secure Other Subsequently Accruing First Lien Obligations, in Accordance with the Collateral Trust Agreement</u>

64.    Section 2.4(d) of the Collateral Trust Agreement mandates as follows for

recipients of Collateral Proceeds payments:

> All proceeds of Collateral received by . . . any holder of Junior Lien Obligations in violation of Section 2.4(c) will be held by such Person in trust for the account of the holders of Parity Lien Obligations and remitted to any Parity Lien Representative upon demand by such Parity Lien Representative.

Collateral Trust Agreement § 2.4(d).  As explained above, the contemplated Second Lien

Refinancing and Second Lien Settlement payments will constitute "proceeds of

Collateral"—an even broader term than "proceeds of Sales of Collateral"—and those

payments will violate section 2.4(c) unless a "Discharge of Parity Lien Obligations" has

occurred.  Accordingly, any Second Lien Indenture Trustee or holder of Second Lien

Notes that receives such payments must comply with section 2.4(d) by holding those

payments in trust for the First Lien Holders, and then remitting those payments to the

First Lien Indenture Trustee upon demand.

65.    To the extent not already demanded in the Redemption Premium Action, the First Lien Indenture Trustee and Collateral Trustee hereby demand from these Defendants turnover of such funds for immediate application to the Redemption Premium and other obligations.

66.    As set forth above, the contractual obligations agreed by the Second Lien Holders through acceptance of the Tender Offer provide that Epiq will receive the Second Lien Settlement payments as holder and/or as agent and attorney-in-fact to the Settling Second Lien Holders.  The tender by Second Lien Holders is effectuated through the anonymity of the book entry system.  To that extent, Epiq is therefore acting as an agent for such undisclosed principals.  Either in its direct capacity standing in the shoes of the Second Lien Holders, or in its capacity as agent for an undisclosed principals, Epiq is bound to comply with the requirements of section 2.4(d) with respect to the Second Lien Settlement payments it receives.

67.    Section 2.04 of the Second Lien Indenture provides that the Second Lien Indenture Trustee shall serve as "Paying Agent" for the Second Lien Notes upon any bankruptcy proceeding of EFIH.  Additionally, pursuant to section 3.05 of the Second Lien Indenture, EFIH may only effect a redemption of Second Lien Notes by depositing with the Second Lien Indenture Trustee or the Paying Agent money sufficient to redeem the applicable Second Lien Notes for distribution to the holders (even though the procedures for effecting the Second Lien Refinancing proposed in the Proposed Second Lien DIP Order violate the foregoing redemption and payment procedures). Accordingly, Computershare is bound to comply with the requirements of section 2.4(d)

of the Collateral Trust Agreement with respect to payments it receives in either its

capacity as Second Lien Indenture Trustee or Paying Agent.

68.     In the Second Lien Redemption Premium Complaint, the Second Lien

Indenture Trustee alleged that the proposed Second Lien Refinancing "would constitute a

'redemption' as described in section 3.07(a) of the [Second Lien] Indenture."  Second

Lien Redemption Premium Complaint § 20.  Under the theory in the Second Lien

Redemption Premium Complaint, refinancing of the First Lien Notes is similarly a

"redemption" under section 3.05 of the First Lien Indenture, and the Second Lien

Indenture Trustee is therefore estopped from arguing otherwise.  Since the Second Lien

Indenture Trustee has conceded that the First Lien Redemption Premium is owed to the

First Lien Indenture Trustee, the Second Lien Indenture Trustee, cannot contest

application of funds remitted under Section 2.4(d) to the First Lien Redemption Premium.

69.     DTC and Cede each is a "holder of Junior Lien Obligations" as defined in

section 2.4(c) of the Collateral Trust Agreement.  The Second Lien Settlement payments

contemplated by the Tender Offer are payments "with respect to Junior Lien Obligations

(including, without limitation, payments [and/or] prepayments made for application to

Junior Lien Obligations)" as such language is used in both the General Second Lien

Payment Restriction and the Insolvency Second Lien Payment Restriction of section

2.4(c).

70.     Further, the Proposed Second Lien DIP Order provides that DTC will

receive the Second Lien Refinancing payments as agent "on behalf of" the Non-Settling

Second Lien Holders.  The Non-Settling Second Lien Holders are not known due to the

anonymity of the book entry system.  To that extent DTC and Cede are acting as an agent for such undisclosed principals, DTC and Cede are bound to comply with the requirements of section 2.4(d) with respect to the Second Lien Payments they receive.

## VI.    PROCEEDS OF THE DIP FINANCINGS CONSTITUTE PART OF THE SENIOR TRUST ESTATE OF THE FIRST LIEN NOTES THAT RECIPIENTS MUST REMIT TO THE FIRST LIEN COLLATERAL AGENT UNTIL DISCHARGE OF FIRST LIEN OBLIGATIONS

71.    Section 2.1 of the Collateral Trust Agreement creates an estate (the "Senior Trust Estate") consisting of the Collateral and provides that "[t]he Collateral Trustee . . . will hold the Senior Trust Estate in trust for the benefit solely and exclusively of all . . . holders of Parity Lien Obligations [(*i.e.* First Lien Notes)]."  Collateral Trust Agreement § 2.1.  The Senior Trust Estate includes "all cash and non-cash proceeds of Collateral." *Id.*

72.    As explained above, the proceeds of the DIP Financings constitute "Collateral" under the Collateral Trust Agreement.  As also explained above, cash advanced as a loan under the DIP Financings, which are to be secured by a lien on the collateral securing the First Lien Notes, constitutes "proceeds" of the collateral of the First Lien Notes.

73.    To the extent of the non-discharged First Lien Obligations, proceeds of DIP Financings become part of the Senior Trust Estate to be held by the Collateral Agent for the benefit of holders of the First Lien Notes.  Until the First Lien Obligations are satisfied through application of such funds, distribution of such Collateral to the Second Lien Holders violates the Senior Trust Estate provisions of the Collateral Trust Agreement.  To the extent that any of those proceeds come into the possession of

Computershare, Epiq, DTC, or Cede, such parties expressly hold in trust for the benefit of the First Lien Holders at least the amounts necessary to satisfy the outstanding First Lien Obligations.

## VII.  CSC TRUST WILL NOT HAVE ADEQUATE REMEDY AT LAW IF THE DEFENDANTS DISTRIBUTE COLLATERAL PROCEEDS TO SECOND LIEN HOLDERS

74.     On information and belief, none of Computershare, Epiq, DTC, or Cede has sufficient liquid assets to satisfy any damages judgment if it is found liable for wrongfully distributing Second Lien Payments further to Second Lien Holders. According to public SEC filings, Computershare N.A. has not more than $30 million of net assets.  Upon information and belief, Computershare Canada also would not have sufficient liquidity to satisfy potential judgments on the claims herein. Also on information and belief, DTC and Cede may assert that they are immune from damages judgments in respect of payments on account of the Second Lien Notes.  Accordingly, CSC Trust will not have any adequate remedy at law with respect to these defendants.

75.     The EFIH Debtors, upon information and belief, have attempted (albeit unsuccessfully) to design the Second Lien Payment to avoid the obligations of the  EFIH Debtors, the Second Lien Indenture Trustee, and the Second Lien Holders under the Collateral Trust Agreement.  The payment mechanics in the Proposed DIP Order have been altered by the EFIH Debtors' from their normal practices.

76.      Thus, the Court must enjoin Computershare, Epiq, DTC and Cede from making the proposed improper distributions of Collateral to Second Lien Holders under

the Second Lien Refinancing and Second Lien Settlement payments, as applicable, to the

extent of the Outstanding First Lien Obligations.

## COUNT I

**(Injunction Requiring Computershare to Remit from any Second Lien Refinancing Payments It Receives Up To an Amount Sufficient to Pay Outstanding First Lien Obligations to the First Lien Indenture Trustee, and Related Declaratory Relief)**

77.     Plaintiff restates and realleges all paragraphs set forth above, which are

incorporated by reference as if set forth in full herein.

78.     The Plaintiff has performed all of its obligations under the Collateral Trust

Agreement.

79.     Computershare is a party to the Collateral Trust Agreement.

80.     Section 2.4(d) of the Collateral Trust Agreement requires Computershare

to remit to the First Lien Indenture Trustee any Second Lien Refinancing payments that

Computershare receives, as Second Lien Indenture Trustee and/or Paying Agent for the

Second Lien Notes, in violation of section 2.4(c) of the Collateral Trust Agreement.

81.     As of the First Lien Refinancing date, at least $432.4 million of

Outstanding First Lien Obligations (including the First Lien Redemption Premium) were

outstanding and those amounts of Outstanding First Lien Obligations have continued and

will continue to accrue.  Any Second Lien Refinancing payments to Computershare will

violate section 2.4(c) of the Collateral Trust Agreement.

82.     Accordingly, Computershare must remit any Second Lien Refinancing

payments it receives to the First Lien Indenture Trustee for immediate application to such

Outstanding First Lien Obligations until all applicable Outstanding First Lien Obligations

are satisfied.  Further, Computershare is prohibited from distributing such payments to

Second Lien Holders unless and until the Outstanding First Lien Obligations are satisfied.

## COUNT II

**(Injunction Requiring Epiq to Remit from any Second Lien Settlement Payments It Receives Up to an Amount Sufficient to Pay Outstanding First Lien Obligations to the First Lien Indenture Trustee, and Related Declaratory Relief)**

83.     Plaintiff restates and realleges all paragraphs set forth above, which are

incorporated by reference as if set forth in full herein.

84.     The Plaintiff has performed all of its obligations under the Collateral Trust

Agreement.

85.     Epiq is a party to the Collateral Trust Agreement, and/or acting as agent

for undisclosed principals who are such parties.

86.     Section 2.4(d) of the Collateral Trust Agreement requires Epiq to remit to

the First Lien Indenture Trustee any Second Lien Settlement payments that Epiq receives,

as agent and attorney-in-fact for Second Lien Holders, in violation of section 2.4(c) of the

Collateral Trust Agreement.

87.     As of the First Lien Refinancing date, at least $432.4 million of

Outstanding First Lien Obligations (including the First Lien Redemption Premium) were

outstanding and those amounts of Outstanding First Lien Obligations have continued and

will continue to accrue.  Any Second Lien Settlement payments to Epiq will violate

section 2.4(c) of the Collateral Trust Agreement.

88.     Accordingly, Epiq must remit any Second Lien Settlement payments it

receives to the First Lien Indenture Trustee for immediate application to such

Outstanding First Lien Obligations until all applicable Outstanding First Lien Obligations are satisfied.  Further, Epiq is prohibited from distributing such payments to Second Lien Holders unless and until all Outstanding First Lien Obligations are satisfied.

## COUNT III

**(Declaratory Judgment and Injunction Requiring DTC and Cede to Remit from any Second Lien Payments It Receives Up To an Amount Sufficient to Pay Outstanding First Lien Obligations to the First Lien Indenture Trustee, and Related Declaratory Relief)**

89.     Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

90.     The Plaintiff has performed all of its obligations under the Collateral Trust Agreement.

91.     DTC and Cede are parties to the Collateral Trust Agreement, and/or acting as agent for undisclosed principals who are party to such agreement.

92.     Section 2.4(d) of the Collateral Trust Agreement requires DTC and Cede to remit to the First Lien Indenture Trustee any Second Lien Payments that DTC and/or Cede receive, as a Second Lien Holder and agent for Second Lien Holders, in violation of section 2.4(c) of the Collateral Trust Agreement.

93.     As of the First Lien Refinancing date, at least $432.4 million of Outstanding First Lien Obligations (including the First Lien Redemption Premium) were outstanding and those amounts of Outstanding First Lien Obligations have continued and will continue to accrue.  Any Second Lien Payments to DTC or Cede will violate section 2.4(c) of the Collateral Trust Agreement.

94.     Accordingly, DTC and Cede must remit to the First Lien Indenture Trustee for immediate application to Outstanding First Lien Obligations any Second Lien Payments they receive, until all applicable Outstanding First Lien Obligations are satisfied.  Further, DTC and Cede are prohibited from distributing such payments to Second Lien Holders unless and until the Outstanding First Lien Obligations are satisfied.

## COUNT IV

**(Injunction Requiring Computershare to Reserve from any Second Lien Refinancing Payments Computershare Receives an Amount Sufficient to Pay Subsequently Accruing First Lien Obligations, and Related Declaratory Relief)**

95.     Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

96.     Section 2.4(d) of the Collateral Trust Agreement requires Computershare to remit to the First Lien Indenture Trustee any Second Lien Refinancing payments that Computershare receives, as Second Lien Indenture Trustee and/or Paying Agent for the Second Lien Notes, in violation of section 2.4(c) of the Collateral Trust Agreement.

97.     The total Subsequently Accruing First Lien Obligations that will be outstanding on December 19, 2016 (the anticipated maturity of the proposed First Lien Priming DIP Facility, including exercise of a six-month extension) will be at least $184.2 (the "Reserve Amount").

98.     Accordingly, Computershare must establish and maintain a reserve (the "Computershare First Lien Reserve") from any Second Lien Refinancing payments it receives in the amount of the Reserve Amount to enable Computershare to pay to the First Lien Indenture Trustee the Subsequently Accruing First Lien Obligations when due,

and Computershare may distribute Second Lien Refinancing payments to Second Lien

Holders only as long as it maintains such Computershare First Lien Reserve.

## COUNT V

**(Injunction Requiring Epiq to Reserve from any Second Lien Settlement Payments Epiq Receives an Amount Sufficient to Pay Subsequently Accruing First Lien Obligations, and Related Declaratory Relief)**

99.     Plaintiff restates and realleges all paragraphs set forth above, which are

incorporated by reference as if set forth in full herein.

100.     Section 2.4(d) of the Collateral Trust Agreement requires Epiq to remit to

the First Lien Indenture Trustee any Second Lien Settlement payments that Epiq receives,

as agent and attorney-in-fact for Second Lien Holders, in violation of section 2.4(c) of the

Collateral Trust Agreement.

101.     The total Subsequently Accruing First Lien Obligations that will be

outstanding on June 19, 2016 (the anticipated maturity of the proposed First Lien Priming

DIP Facility) will be the Reserve Amount.

102.     Accordingly, Epiq must establish and maintain a reserve (the "Epiq First

Lien Reserve") from any Second Lien Repayments it receives in the amount of the

Reserve Amount to enable Epiq to pay to the First Lien Indenture Trustee the

Subsequently Accruing First Lien Obligations when due, and Epiq may distribute Second

Lien Settlement payments to Second Lien Holders only as long as it maintains such Epiq

First Lien Reserve.

## COUNT VI

**(Injunction Requiring DTC and Cede to Reserve from any Second Lien Payments They Receive an Amount Sufficient to Pay Subsequently Accruing First Lien Obligations, and Related Declaratory Relief)**

103.    Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

104.    Section 2.4(d) of the Collateral Trust Agreement requires DTC and Cede to remit to the First Lien Indenture Trustee any Second Lien Payments that DTC and/or Cede receive, as a Second Lien Holder and agent for Second Lien Holders, in violation of section 2.4(c) of the Collateral Trust Agreement.

105.    The total Subsequently Accruing First Lien Obligations that will be outstanding on June 19, 2016 (the anticipated maturity of the proposed First Lien Priming DIP Facility) will be the Reserve Amount.

106.    Accordingly, DTC and Cede must establish and maintain a reserve (the "DTC/Cede First Lien Reserve") from any Second Lien Payments they receive in the amount of the Reserve Amount to enable DTC to pay to the First Lien Indenture Trustee the Subsequently Accruing First Lien Obligations when due, and DTC and Cede may distribute Second Lien Payments to Second Lien Holders only as long as they maintain such DTC/Cede First Lien Reserve.

## COUNT VII

**(Judgment and Declaratory Judgment Against Computershare for Breach of Contract)**

107.    Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

108.    Computershare was and is a party to the Collateral Trust Agreement.

109.    Computershare will breach the Collateral Trust Agreement by making prohibited Second Lien Payments in violation of section 2.4(c) of the Collateral Trust Agreement.

110.    Computershare will breach the Collateral Trust Agreement by refusing to remit to the First Lien Indenture Trustee the proceeds of the DIP Financings in accordance with section 2.4(d) of the Collateral Trust Agreement.

111.    Alternatively, Computershare will breach the Collateral Trust Agreement by paying the Second Lien Refinancing to Second Lien Holders from money that is part of the Collateral Trust Estate in violation of the Collateral Trust Agreement.

112.    CSC Trust, as First Lien Indenture Trustee on behalf of First Lien Holders will suffer damages from dissipation of the First Lien Notes' collateral to Second Lien Holders prior to discharge of the First Lien Notes.

<u>**COUNT VIII**</u>

**(Judgment and Declaratory Judgment Against Epiq for Breach of Contract)**

113.    Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

114.    Epiq, as agent and attorney-in-fact to Second Lien Holders, was and is a party to the Collateral Trust Agreement.

115.    Epiq will breach the Collateral Trust Agreement by making prohibited Second Lien Settlement payments in violation of section 2.4(c) of the Collateral Trust Agreement.

116. Epiq will breach the Collateral Trust Agreement by refusing to remit to the First Lien Indenture Trustee the proceeds of the DIP Financings in accordance with section 2.4(d) of the Collateral Trust Agreement.

117. Alternatively, Epiq will breach the Collateral Trust Agreement by paying Second Lien Settlement payments to Second Lien Holders from money that is part of the Collateral Trust Estate in violation of the Collateral Trust Agreement.

118. CSC Trust, as First Lien Indenture Trustee on behalf of First Lien Holders will suffer damages from dissipation of the First Lien Notes' collateral to Second Lien Holders  prior to discharge of the First Lien Notes.

## COUNT IX

### (Judgment and Declaratory Judgment Against DTC and Cede for Breach of Contract)

119. Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

120. DTC and Cede, as Second Lien Holders and agents for Second Lien Holders, were and are parties to the Collateral Trust Agreement.

121. DTC and Cede will breach the Collateral Trust Agreement by making prohibited Second Lien Payments in violation of section 2.4(c) of the Collateral Trust Agreement.

122. DTC and Cede will breach the Collateral Trust Agreement by refusing to remit to the First Lien Indenture Trustee the proceeds of the DIP Financings in accordance with section 2.4(d) of the Collateral Trust Agreement.

123.   Alternatively, DTC and Cede will breach the Collateral Trust Agreement by paying Second Lien Payments to Second Lien Holders from money that is part of the Collateral Trust Estate in violation of the Collateral Trust Agreement.

124.   CSC Trust, as First Lien Indenture Trustee on behalf of First Lien Holders will suffer damages from dissipation of the First Lien Notes' collateral to Second Lien Holders prior to discharge of the First Lien Notes.

## COUNT X

**(Judgment and Declaratory Judgment Against Computershare for Conversion)**

125.   Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

126.   The First Lien Indenture Trustee has ownership rights in the proceeds of the DIP Financings to the extent of amounts outstanding under the First Lien Notes.

127.   Computershare will deprive the First Lien Indenture Trustee of such ownership rights by making the Second Lien Refinancing to Second Lien Holders without the authorization of the First Lien Indenture Trustee.

128.   Alternatively, Computershare has no right or title to the proceeds of the DIP Financings to the extent of amounts outstanding under the First Lien Notes, and making Second Lien Refinancing from such funds will constitute unauthorized use.

129.   Alternatively, the Second Lien Refinancing from proceeds of the DIP Financings, to the extent of amounts outstanding under the First Lien Notes, to Second Lien Holders will constitutes delivery of property to people who are not entitled to possession of such property.

## COUNT XI

**(Judgment and Declaratory Judgment Against Epiq for Conversion)**

130.    Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

131.    The First Lien Indenture Trustee has ownership rights in the proceeds of the DIP Financings to the extent of amounts outstanding under the First Lien Notes.

132.    Epiq will deprive the First Lien Indenture Trustee of such ownership rights by making the Second Lien Settlement payments to Second Lien Holders without the authorization of the First Lien Indenture Trustee.

133.    Alternatively, Epiq has no right or title to the proceeds of the DIP Financings to the extent of amounts outstanding under the First Lien Notes, and making Second Lien Settlement payments from such funds will constitute unauthorized use.

134.    Alternatively, the Second Lien Settlement payments from proceeds of the DIP Financings, to the extent of amounts outstanding under the First Lien Notes, to Second Lien Holders will constitute delivery of property to people who are not entitled to the property's possession.

## COUNT XII

**(Judgment and Declaratory Judgment Against DTC and Cede for Conversion)**

135.    Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

136.    The First Lien Indenture Trustee has ownership rights in the proceeds of the DIP Financings to the extent of amounts outstanding under the First Lien Notes.

137.    DTC and Cede will deprive the First Lien Indenture Trustee of such ownership rights by making the Second Lien Payments to Second Lien Holders without the authorization of the First Lien Indenture Trustee.

138.    Alternatively, neither DTC nor Cede has right or title to the proceeds of the DIP Financings to the extent of amounts outstanding under the First Lien Notes, and making Second Lien Payments from such funds will constitute unauthorized use.

139.    Alternatively, the Second Lien Refinancing from proceeds of the DIP Financings, to the extent of amounts outstanding under the First Lien Notes, to Second Lien Holders will constitutes delivery of property to people who are not entitled to the property's possession.

WHEREFORE, the First Lien Indenture Trustee and Collateral Trustee demand that, upon a final determination by this Court, judgment be entered in its favor and against the Defendants, as follows:

A.    An injunction requiring that Computershare remit from any Second Lien Refinancing payments that it receives an amount sufficient to pay all Outstanding First Lien Obligations to the First Lien Indenture Trustee, and related declaratory relief.

B.    An injunction requiring that Epiq remit from any Second Lien Settlement payments that it receives an amount sufficient to pay all Outstanding First Lien Obligations to the First Lien Indenture Trustee, and related declaratory relief.

C.    An injunction requiring that DTC and Cede remit from any Second Lien Payments that they receive an amount sufficient to pay all Outstanding First Lien Obligations to the First Lien Indenture Trustee, and related declaratory relief.

D.    Determination at trial of the appropriate Reserve Amount, and an injunction requiring Computershare to establish and maintain the Computershare First Lien Reserve from any Second Lien Refinancing payments that Computershare receives, and related declaratory relief.

E.    An injunction requiring Epiq to establish and maintain the Epiq First Lien Reserve from any Second Lien Settlement payments that Epiq receives, and related declaratory relief.

F.    An injunction requiring DTC and Cede to establish and maintain the DTC/Cede First Lien Reserve from any Second Lien Payments that DTC receives, and related declaratory relief.

G.    A judgment against Computershare for damages resulting from its breach of the Collateral Trust Agreement, or if the Second Lien Payments have not occurred at the time of determination, a declaratory judgment.

H.    A judgment against Epiq for damages resulting from its breach of the Collateral Trust Agreement, or if the Second Lien Payments have not occurred at the time of determination, a declaratory judgment.

I.      A judgment against DTC and Cede for damages resulting from their breach of the Collateral Trust Agreement, or if the Second Lien Payments have not occurred at the time of determination, a declaratory judgment.

J.      A judgment against Computershare for damages resulting from its conversion of assets, or if the Second Lien Payments have not occurred at the time of determination, a declaratory judgment.

K.      A judgment against Epiq for damages resulting from its conversion of assets, or if the Second Lien Payments have not occurred at the time of determination, a declaratory judgment.

L.      A judgment against DTC and Cede for damages resulting from their conversion of assets, or if the Second Lien Payments have not occurred at the time of determination, a declaratory judgment.

M.      Granting the First Lien Indenture Trustee and Collateral Trustee such other and further relief as the Court deems just and appropriate.

*[remainder of page intentionally left blank]*

Dated:  June 20, 2014

COLE, SCHOTZ, MEISEL, FORMAN
& LEONARD, P.A.


/s/ Norman L.Pernick
Norman L. Pernick (No. 2290)          Warren A. Usatine
J. Kate Stickles (No. 2917)           25 Main Street,
500 Delaware Avenue, Suite 1410       P.O. Box 800
Wilmington, DE  19801                 Hackensack, NJ 07602
Telephone: 302-652-3131               Telephone: 201-489-3000
Facsimile:  302-652-3117              Facsimile:  201-489-1536
npernick@coleschotz.com              wusatine@coleschotz.com
kstickles@coleschotz.com

    --and--

ROPES & GRAY LLP
Keith H. Wofford                      D. Ross Martin
Mark R. Somerstein                    Andrew G. Devore
1211 Avenue of the Americas          Prudential Tower
New York, NY 10036-8704              800 Boylston Street
Telephone: 212-596-9000              Boston, MA  02199-3600
Facsimile:  212-596-9090            Telephone: 617-951-7000
Keith.Wofford@ropesgray.com          Facsimile: 617-951-7050
Mark.Somerstein@ropesgray.com        Ross.Martin@ropesgray.com
                                      Andrew.Devore@ropesgray.com


*Counsel for CSC Trust Company of Delaware,
as successor indenture trustee and collateral trustee*

    --and--

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:  212-248-3141
James.Millar@dbr.com


*Counsel for CSC Trust Company of Delaware,
as successor indenture trustee*