## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ENERGY FUTURE<br>HOLDINGS CORP., *et al.*, | Case No. 14-10979 (CSS) |
| *Debtors.* | (Jointly Administered) |
| DELAWARE TRUST COMPANY, as<br>Indenture Trustee and Collateral Trustee, | |
| *Plaintiff,* | |
| v. | Adversary Proceeding<br>No. 14-50410 (CSS) |
| COMPUTERSHARE TRUST COMPANY,<br>N.A. and COMPUTERSHARE TRUST<br>COMPANY OF CANADA, as Indenture<br>Trustee and Paying Agent | |
| *Defendants.* | |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY JUDGMENT AND INJUNCTION

1.     Delaware Trust Company ("Delaware Trust"), as (i) indenture trustee (the "First Lien Trustee") for the (a) 10% notes ("10% First Lien Notes") issued by the EFIH Debtors (as defined below) under the Indenture dated as of August 17, 2010 (together with all supplements, amendments, and exhibits, the "10% Notes First Lien Indenture," a copy of which is attached hereto as Exhibit A) between Energy Future Intermediate Holding Company LLC ("EFIH"), EFIH Finance Inc. ("EFIH Finance," and together with EFIH, the "EFIH Debtors"), and the First Lien Trustee and (b) 6.875%  notes

1

("6.875% First Lien Notes," and, collectively with the 10% First Lien Notes, the "First Lien Notes") issued by the EFIH Debtors under the Indenture dated as of August 14, 2012 between EFIH, EFIH Finance, and the First Lien Trustee (together with all supplements, amendments, and exhibits, the "6.875% Notes First Lien Indenture," a copy of which is attached hereto as Exhibit B, and together with the 10% Notes First Lien Indenture, the "First Lien Indentures") and (ii) as Collateral Trustee under the Collateral Trust Agreement dated as of November 16, 2009 (including joinders thereto, the "Collateral Trust Agreement," a copy of which is attached hereto as Exhibit C), in each capacity as successor to The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon"), by its undersigned counsel, hereby alleges for its Complaint against Defendants Computershare Trust Company, N.A. ("Computershare N.A.") and Computershare Trust Company of Canada ("Computershare Canada," and collectively with Computershare N.A., "Computershare"), as successor indenture trustee and paying agent to BNY Mellon (the "Second Lien Trustee") for the notes ("Second Lien Notes") issued under the Indenture dated as of April 25, 2011 (together with all supplements, amendments, and exhibits, the "Second Lien Indenture," a copy of which is attached hereto as Exhibit D), and upon knowledge of its own acts and upon information and belief as to all matters, as follows:

### NATURE OF ACTION

2.      In this action, the First Lien Trustee and Collateral Trustee seek a declaration that the Second Lien Trustee must turn over future distributions it receives from the EFIH Debtors in these bankruptcy cases until the First Lien Trustee receives

payment in full of not less than approximately $488 million of obligations currently owed to it (the "First Lien Obligations").

3.    The Collateral Trust Agreement entered into by the Second Lien Trustee (i) bars payment from, and (ii) creates a turnover right with respect to, specified funds described below ("CTA Funds") until First Lien Obligations are paid in full in cash.

4.    The scope of "First Lien Obligations" under the Collateral Trust Agreement is broader than, and independent from, the obligations enforceable in bankruptcy against the EFIH Debtors.  Specifically, the Collateral Trust Agreement requires the Second Lien Trustee to freeze and remit funds to the First Lien Trustee even if the First Lien Make-Whole Premium (as defined below) or other First Lien Obligations may not be collected from the EFIH Debtors by virtue of the operation of the Bankruptcy Code.  Also, even if the First Lien Make-Whole Premium is allowed and the EFIH Debtors cram down such claim, the Collateral Trust Agreement restrictions would remain to the extent necessary to effect full payment to the First Lien Trustee.

5.    In short, the Collateral Trust Agreement provides that, vis á vis the Second Lien Trustee, "First Lien Obligations" include whatever is "payable under the documentation governing the [First Lien Notes]" (see Collateral Trust Agreement § 1.01, "Obligations"), *not* as such State law rights are abridged by the automatic stay or other facets of chapter 11.

6.    This Court has held that the First Lien Make-Whole Premium asserted by the First Lien Trustee (and supported by the Second Lien Trustee) is an obligation under the First Lien Indenture, but that enforcement is forestalled by the Bankruptcy Code

automatic stay: "[i]f the Court were to lift the automatic stay, the [First Lien Make-Whole Premium] would be due."[1]

7.       There are three sources of CTA Funds subject to the rights of the First Lien Trustee under the Collateral Trust Agreement. *First* is cash received as dividends from EFIH's equity interests in Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), both before and after the EFIH Debtors' bankruptcy petitions.  At the very least, applying the lowest-intermediate balance rule based on publicly available financial reports, there was not less than $284 million of such dividend cash used in the partial paydown of Second Lien Notes on March 12, 2015 ("Partial Paydown").

8.       *Second* are loan proceeds of the EFIH Debtors' first lien DIP facility. Those proceeds of a secured financing, done on a priming basis, fall within both the contractual definition of "Asset Sale" and the Uniform Commercial Code ("UCC") definition of "proceeds," both of which make the loan proceeds subject to the rights of the First Lien Trustee.  These first lien DIP proceeds were, like the cash dividends, distributed to the Second Lien Trustee as a portion of the Partial Paydown.  All amounts of the Partial Paydown that did not consist of dividend cash instead consisted of these financing proceeds.

9.       *Third* are proceeds of any other direct or indirect sale of Oncor Holdings stock, if and when such Oncor Holdings interests are sold, whether through a third party sale or a plan of reorganization.

---

[1] Findings of Fact and Conclusions of Law Regarding Cross-Motions for Summ. J. at 28, *Delaware Trust Co. v. Energy Future Intermediate Holding Co.*, Ch. 11 Case No. 14-10979-CSS, Adv. No. 14-50363-CSS (Mar. 26, 2015), D.I. 245.

10.    The obligation of the Second Lien Trustee to hold and remit CTA Funds exists until the First Lien Obligations are paid in full, in cash (or satisfied by another form of consideration stipulated under the Partial Paydown Order described below, if applicable).  The First Lien Obligations that are entitled to satisfaction prior to future distributions to the Second Lien Trustee include, without limitation:

- The approximately $466.9 million First Lien Make-Whole Obligations (as defined below) or related claims for damages;

- Approximately $1.1 million in additional interest resulting from EFIH's failure to  publicly register certain of the First Lien Notes;

- Approximately $0.6 million for interest on interest due from June 1, 2014 to June 19, 2014;

- The fees and expenses of the First Lien Trustee, including without limitation, fees of counsel and financial advisors to the First Lien Trustee; and

- Applicable interest on the foregoing amounts, accruing at the rates set forth in the First Lien Indentures and associated documents.

11.    To postpone resolution of the intercreditor issues concerning the Partial Paydown, the Second Lien Trustee agreed with the First Lien Trustee and EFIH Debtors that any future distributions would be subject to turnover as if those future distributions were the amounts received for the Partial Paydown.  This Court has entered orders, both in approving the Partial Paydown and in this Adversary Proceeding, to effectuate this agreement.[2]

12.    Accordingly, this Complaint seeks declaratory judgment and related relief, *inter alia*, to require that the Second Lien Trustee (i) immediately remit future

---

[2] *See* Order Authorizing Partial Repayment of EFIH Second Lien Notes; (B) Approving EFIH DIP Consent; and (C) Authorizing Consent Fee, *In re Energy Future Holdings Corp.*, Ch. 11 Case No. 14-10979-CSS (Bankr. D. Del. Mar. 10, 2014), D.I. 3855; Order with Respect to Partial Repayment Order, Mar. 12, 2015, D.I. 46 (the "Partial Paydown Order").

distributions on account of the Second Lien Notes to the First Lien Trustee, and (ii) hold

in trust and reserve amounts for payment of all First Lien Obligations before making any

further payments or transfers to holders of Second Lien Notes, including in respect of any

distributions under a plan of reorganization.

## JURISDICTION AND VENUE

13.     Jurisdiction exists over this adversary proceeding pursuant to 28 U.S.C.

§ 157 and (i) 28 U.S.C. § 1334 because it arises under the Bankruptcy Code and it arises

in the chapter 11 cases of the EFIH Debtors pending in the United States Bankruptcy

Court for the District of Delaware, jointly administered under the case of *In re Energy*

*Future Holdings Corp.*, Case No. 14-10979 (CSS) (together, the "Chapter 11 Cases") and

(ii) 28 U.S.C. § 1332 because there exists diversity among the parties and the matter in

controversy exceeds $75,000.

14.     The predicates for relief are sections 105(a) and 510(a) of Chapter 11, title

11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), 28

U.S.C. § 2201,  Rule 7065 of the Federal Rules of Bankruptcy Procedure, and common

law and equity.

15.     The claims for relief herein are core matters under 28 U.S.C.

§ 157(b)(2)(K), (O).  The First Lien Trustee and the Collateral Trustee hereby consent to

entry of final orders by the Bankruptcy Court with respect to the relief requested in this

Complaint.

16.     Venue of this Adversary Proceeding in this district is proper pursuant to

28 U.S.C. § 1409(a) because the above-captioned chapter 11 proceeding in which this

case arises is pending in this District, and none of the exceptions of subsections (b)-(d) apply.

## PARTIES

17.     Plaintiff Delaware Trust is a Delaware state chartered trust company having its principal place of business in Wilmington, Delaware.[3]  Delaware Trust is the indenture trustee under the First Lien Indentures.  Delaware Trust is also the Collateral Trustee under the Collateral Trust Agreement.  The First Lien Trustee has filed proofs of claim in the Chapter 11 Cases, attached as Exhibits E-1 through E-9 hereto, and incorporated herein by reference.

18.     On May 15, 2014, the First Lien Trustee commenced an action (the "First Lien Make-Whole Adversary") to determine its entitlement to a make-whole premium (the "First Lien Make-Whole Premium") and interest thereon in connection with First Lien Refinancing (as defined below).[4]

19.     Defendant Computershare N.A. is a federally chartered trust company under the laws of the United States having its principal office and place of business in Canton, Massachusetts.  Defendant Computershare Canada is a trust company chartered under the laws of Canada having its principal place of business in Toronto, Ontario, Canada.  Computershare N.A. and Computershare Canada, collectively, is the indenture trustee and paying agent under the Second Lien Indenture.  The Second Lien Trustee has filed proofs of claim in the Chapter 11 Cases, attached as Exhibits F-1 through F-2

---

[3] Since filing the Amended Complaint, Plaintiff Delaware Trust has changed its corporate name to "Delaware Trust Company" from "CSC Trust Company of Delaware."

[4] Compl. for Declaratory Relief, *Delaware Trust Co. v. Energy Future Intermediate Holding Co.*, Ch. 11 Case No. 14-10979-CSS, Adv. No. 14-50363-CSS (May 15, 2014), ECF No. 1.

hereto, and incorporated herein by reference, asserting a secured claim.  The Second Lien

Trustee has commenced an action to determine its entitlement to a make-whole premium

(the "Second Lien Make-Whole Adversary").[5]  The Second Lien Trustee has intervened

in the First Lien Make-Whole Adversary and supported the First Lien Trustee's

entitlement to the First Lien Make-Whole Premium.  Notice of Intervention, First Lien

Make-Whole Adversary, D.I. 19. The Second Lien Trustee is party to the Collateral Trust

Agreement.

## FACTS

20.    On April 29, 2014 (the "Petition Date"), the EFIH Debtors filed voluntary

petitions for relief under the Bankruptcy Code.  Their Chapter 11 Cases remain pending

in the United States Bankruptcy Court for the District of Delaware.

## I.    BACKGROUND

### A.    *Corporate Structure*

21.    The parent debtor among the entities in these Chapter 11 Cases is Energy

Future Holdings Corp. ("EFH").  At all relevant times, one of its wholly owned

subsidiaries has been, and is, EFIH.  At all relevant times, EFIH has owned, and does

own, 100% of the equity interests in Oncor Holdings, which in turn owns approximately

80% of the equity interests in Oncor Electric Delivery Company LLC, which operates the

largest electric utility company in Texas.  EFIH's equity interest in Oncor Holdings is its

largest asset.

---

[5] Compl. for Declaratory Relief, *Computershare Trust Co. v. Energy Future Intermediate Holding Co.*, Ch. 11 Case No. 14-10979-CSS, Adv. No. 14-50405-CSS (June 16, 2014), ECF No. 1.

B.    ***Secured Debt***

22.    EFH undertook what it called a "Liability Management Program" starting in 2009.  EFIH and EFIH Finance entered into an Indenture dated as of November 16, 2009 (the "Reference Indenture"), a copy of which is attached as Exhibit G hereto, under which they issued certain Senior Secured Notes due 2019, secured by a first priority lien on EFIH's equity interest in Oncor Holdings.

23.    At that time, EFH and EFIH contemplated that they might issue additional first lien and second lien notes, so, at the same time it entered into the Reference Indenture, EFIH also entered into the Collateral Trust Agreement on November 16, 2009, for the benefit of all future indenture trustees and holders of notes that had the benefit of a first lien on Oncor Holdings equity.

24.    Thereafter, as part of the Liability Management Program, EFIH issued under new indentures the approximately $4 billion of EFIH First Lien Notes and $2.2 billion of EFIH Second Lien Notes, which principal amounts remained outstanding as of the Petition Date.  EFIH used these notes for exchange offers, among other things.  These notes are all secured by EFIH's equity interest in Oncor Holdings, and thus dividends (which have been and continue to be regularly been paid to EFIH quarterly) are both direct collateral and proceeds of collateral.  Cash has continually flowed into EFIH from these dividends, and such cash is proceeds of collateral securing the First Lien Notes and Second Lien Notes.

25.    The Collateral Trust Agreement governs the rights and obligations of the indenture trustees for those notes – the First Lien Trustee and the Second Lien Trustee.

Although EFIH is no longer a guarantor of any notes issued under the Reference Indenture, the Collateral Trust Agreement continues to incorporate certain definitions from the Reference Indenture, as those agreements were executed and delivered at the same time.

C.    ***Court Order Provides That Future Distributions to the Second Lien Trustee Are to Be Treated in the Same Manner as the Partial Paydown***

26.    Resolving potential objections of the First Lien Trustee to consummation of the Partial Paydown prior to discharge of First Lien Obligations, the Second Lien Trustee and EFIH Debtors agreed that the order approving the Partial Paydown would preserve the First Lien Trustee's right to seek turnover of the Partial Paydown amount from any future payments to the Second Lien Notes, based on any legal and factual arguments that would have applied to the Partial Paydown.  Specifically, the Partial Paydown Order provided in relevant part (the "Carry-Over Provision"):

> At the election of the EFIH First Lien Trustee, any and all consideration (other than the Partial Repayment) paid after entry of this Order by any EFIH Debtor to the EFIH Second Lien Trustee, any EFIH Second Lien Noteholder, the Paying Agent under the Collateral Trust Agreement, or any other entity for the benefit of EFIH Second Lien Noteholders, on account of, or in connection with, the EFIH Second Lien Notes (collectively, the "Future Repayment Claims"), including, for the avoidance of doubt, distributions or other forms of consideration under any plan of reorganization (collectively, the "Future Distributions"), but only up to the amount of the Partial Repayment, shall be subject to the claims asserted in the Intercreditor Adversary Proceeding as though such Future Distributions were the same, in kind, nature, and all other legally relevant characteristics, as the Partial Repayment (including without limitation, the source of funds used to make the Partial Repayment).

All arguments and rights of the Collateral Trustee, Parity Lien Representative (as defined in the Collateral Trust Agreement), and holders of Parity Lien Obligations (as defined in the Collateral Trust Agreement) that would have applied to the Partial Repayment shall apply to all Future Distributions, until all claims of the EFIH First Lien Trustee or Collateral Trustee in the Intercreditor Adversary Proceeding are determined by Court order. To the extent the EFIH First Lien Trustee shows in the Intercreditor Adversary Proceeding that it would have prevailed on any potential claims under the Collateral Trust Agreement with respect to the Partial Repayment but for the EFIH First Lien Trustee's agreement set forth in this Order to consent to the Partial Repayment, as reflected in a Court order or ruling in effect in such Intercreditor Adversary Proceeding, then the EFIH First Lien Trustee shall be entitled to relief under the Collateral Trust Agreement through turnover to the Collateral Trustee of Future Distributions in an amount agreed to or set by the Court, not to exceed the Partial Repayment; provided, however, any such turnover or right to payment shall be in the same form and nature of such Future Distributions (including in a pro rata amount to the extent the Future Distributions are in multiple forms of consideration).

Partial Paydown Order ¶ 11-12. The Court has entered a corresponding order incorporating these identical provisions in this Adversary Proceeding. Order with Respect to Partial Repayment Order, D.I. 46. As recognized in the final proviso of the Carry-Over Provision, the First Lien Trustee has agreed that payment of the form of consideration specified therein under the circumstances specified therein will constitute discharge of the First Lien Obligations for purposes of the Collateral Trust Agreement.

II.    **THE SECOND LIEN TRUSTEE MUST TURN OVER FROM FUTURE EFIH DEBTOR DISTRIBUTIONS TO THE FIRST LIEN TRUSTEE AN AMOUNT TO SATISFY THE FIRST LIEN OBLIGATIONS (INCLUDING THE FIRST LIEN MAKE-WHOLE OBLIGATIONS) , WHICH CONSTITUE "OBLIGATIONS" UNDER THE COLLATERAL TRUST AGREEMENT**

A.    ***The Collateral Trust Agreement Requires Turn Over of CTA Funds Until Discharge of First Lien Obligations***

27.    The Collateral Trust Agreement requires the Second Lien Trustee to turn over CTA Funds received until the First Lien Obligations are paid in full in cash.  The First Lien Obligations are referred to in the Collateral Trust Agreement as "Parity Lien Obligations."

B.    ***The First Lien Obligations Are Outstanding Under the Collateral Trust Agreement***

28.    On June 19, 2014, EFIH refinanced the First Lien Notes (the "First Lien Refinancing").  The First Lien Make-Whole Premium with respect to that redemption is a Parity Lien Obligation under the Collateral Trust Agreement, because, *inter alia*, such make-whole premium is "payable under the documentation governing the [First Lien Notes]."  Collateral Trust Agreement § 1.1 "Obligations."

29.    The First Lien Trustee has not been paid in full in cash with respect to the obligation of EFIH to pay the First Lien Make-Whole Premium.  In addition the First Lien Trustee has not been paid in full in cash in respect of the allowable claim with respect thereto.

30.    The First Lien Notes state that interest is payable on overdue premium. First Lien Indenture, Exhibit A ¶ (1).  Such interest has been accruing since June 19, 2014 and continues to accrue at a rate of 10% per annum (plus applicable unpaid interest

12

relating to registration rights obligations with respect to certain series of the 10% First

Lien Notes) for approximately $430.8 million of the First Lien Make-Whole Premium (in

respect of approximately $2.3 billion of the First Lien Notes), and 6.875% per annum

(plus applicable unpaid interest relating to registration rights obligations) for the

remaining approximately $1.05 million of the First Lien Make-Whole Premium (in

respect of approximately $13.435 million of non-settling 6.875% First Lien Notes).  The

First Lien Make-Whole Premium and such interest are collectively referred to as the

"First Lien Make-Whole Obligations."

  31. In addition to the First Lien Make-Whole Obligations, EFIH is obligated

to pay other First Lien Obligation amounts to the First Lien Trustee in respect of the First

Lien Notes and the Collateral Trustee in respect of the Collateral Trust Agreement,

including the following:

    i. Approximately $1.1 million of pre- and post-petition interest (including unpaid interest accruing due to failure to register certain First Lien Notes that remained accrued and unpaid as of June 19, 2014, and interest on overdue interest);

    ii. Approximately $0.6 million in interest not paid for the period from June 1, 2014 through June 19, 2014;

    iii. Trustee fees and expenses of the First Lien Trustee under the terms of the First Lien Indenture, and any subsequent trustee fees accruing ("Unpaid Trustee Fees");

    iv. Reimbursement for compensation of, and expenses paid by, the First Lien Trustee, including fees and expenses of its counsel, under section 7.07 of the First Lien Indenture, and any subsequent professional compensation accruing ("Unpaid Trustee Professional Reimbursement"); and

v.    All other amounts identified in the proofs of claim of Delaware Trust Company, as Indenture Trustee and Collateral Trustee, filed in the Chapter 11 Cases of the EFIH Debtors on October 27, 2014.

32.    Thus, the Second Lien Trustee must turn over to the First Lien Trustee any CTA Funds it receives from the EFIH Debtors if either (i) the amounts of the First Lien Obligations are not allowed against the EFIH Debtors in the Chapter 11 Cases by virtue of the Bankruptcy Code (rather than State law), or (ii) such amounts are allowed against the EFIH Debtors, but a confirmed chapter 11 plan provides satisfaction of the resulting claims through consideration that does not satisfy the payment in full in cash requirements under the Collateral Trust Agreement and/or the applicable terms of the Carry-Over Provision, through cram-down or otherwise.

C.    ***The First Lien Obligations Constitute "Obligations" Under the Applicable Collateral Trust Agreement Definition***

33.    The Collateral Trust Agreement provides that "Parity Lien Obligations" include all other "Obligations" in respect of the First Lien Notes, and "Obligations" is defined to include any make whole premium "payable under the documentation governing any [First Lien Notes]." Collateral Trust Agreement § 1.1 "Obligations." The Second Lien Trustee has stated that the First Lien Make-Whole Obligations are valid obligations of the EFIH Debtors, and the Second Lien Trustee would, as an intervenor appeal any adverse ruling in the First Lien Make-Whole Adversary, and/or a similar disallowance ruling in its own Second Lien Make-Whole Adversary. Intervenor EFIH Second Lien Indenture Trustee's Brief, First Lien Make-Whole Adversary, D.I. 198. Even if the First Lien Trustee is prevented from collecting the First Lien Make-Whole Obligations from the EFIH Debtors by operation of the Bankruptcy Code, such amounts

14

remain Parity Lien Obligations under the Collateral Trust Agreement with respect to the Second Lien Trustee, and the Second Lien Trustee must turn over CTA Funds it receives to the First Lien Trustee on account thereof.

34.    This Court has held that, absent the Bankruptcy Code's automatic stay, the First Lien Make-Whole Premium "would be due and owing."[6] Thus, the First Lien Make-Whole Premium—owing under the First Lien Notes documentation—constitutes "Obligations" that must be paid in full in cash before any Second Lien Payments.

35.    The Collateral Trust Agreement governs the relationship between the First Lien Trustee and Second Lien Trustee, both before and after the EFIH Debtors' bankruptcy. Even if the EFIH Debtors are entitled to use tools provided by their bankruptcy cases, those tools protecting the EFIH Debtors—including the automatic stay—do not override provisions of the Collateral Trust Agreement allocating rights between the First Lien Trustee and the Second Lien Trustee.

## III.    THE PARTIAL PAYDOWN VIOLATED TWO SEPARATE PROHIBITIONS APPLICABLE TO THE CTA FUNDS

36.    Section 2.4(c) of the Collateral Trust Agreement contains two separate and independent prohibitions on the Second Lien Trustee retaining the Partial Paydown or receiving future distributions from CTA Funds (together, the "Second Lien Payment Restrictions").

37.    One of the Second Lien Payment Restriction prohibitions is generally applicable at any time, whether before or after commencement of the Chapter 11 Cases

---

[6] Findings of Fact and Conclusions of Law Regarding Cross-Motions for Summ. J. ¶ 68, First Lien Make-Whole Adversary, D.I. 245.

(the "General Second Lien Payment Restriction"); the other prohibition applies only after

the commencement of a bankruptcy or certain default and remedy actions (the

"Insolvency Second Lien Payment Restriction").

38.    Both of these Second Lien Payment Restrictions were in effect at the time

of the Partial Paydown and are in effect now.  Each recipient of payments, including the

Second Lien Trustee, is required to hold any such funds received in trust for the First

Lien Holders and remit those amounts to the First Lien Trustee upon demand until all

First Lien Obligations are discharged in full and in cash.

39.    The Collateral Trust Agreement (which predates the First Lien Indenture

and Second Lien Indenture) refers to the obligations owed under the First Lien Notes and

the First Lien Trustee as "Parity Lien Obligations" and the "Parity Lien Representative,"

respectively.  It refers to the obligations owed under the Second Lien Notes and the

Second Lien Trustee as "Junior Lien Obligations" and the "Junior Lien Representative,"

respectively.

40.    The General Second Lien Payment Restriction addresses "proceeds

resulting from" the defined term "Sale of Collateral," and provides, in relevant part:

> at any time prior to the Discharge of Parity Lien
> Obligations, no payment shall be made to … any Junior
> Lien Representative or any holder of Junior Lien
> Obligations with respect to Junior Lien Obligations
> (including, without limitation, payments and prepayments
> made for application to Junior Lien Obligations) (i) *from
> the proceeds resulting from a Sale of Collateral* . . . .

Collateral Trust Agreement § 2.4(c)(i) (emphasis added).  Accordingly, any proceeds

resulting from a Sale of Collateral must be applied first to effect a "Discharge of Parity

16

Lien Obligations" before Second Lien Holders may receive any payments from those amounts.

41.    Separately, the Insolvency Second Lien Payment Restriction addresses any "proceeds" of "Collateral," and provides:

> At any time prior to the Discharge of Parity Lien Obligations and after (1) the commencement of any Insolvency or Liquidation Proceeding in respect of EFIH . . . no payment of money (or the equivalent of money) shall be made *from the proceeds of Collateral* by EFIH to . . . any Junior Lien Representative or any holder of Junior Lien Obligations with respect to Junior Lien Obligations (including, without limitation, payments and prepayments made for application to Junior Lien Obligations).

Collateral Trust Agreement § 2.4(c) (emphasis added).

42.    Section 2.4(d) of the Collateral Trust Agreement provides that if the Junior Lien Representative or any holder of Junior Lien Obligations receives any amounts in violation of these Second Lien Payment Restrictions, then such amounts are held in trust and must be turned over to Delaware Trust on demand, until "Discharge of Parity Lien Obligations" in full and in cash.

A.    ***Partial Paydown from Oncor Holdings Dividends Violated the Insolvency Second Lien Payment Restriction Because Such Funds Constituted Both Cash Collateral and "Proceeds of Collateral"***

43.    Cash on hand used in the Partial Paydown was cash collateral and proceeds of collateral constituting CTA Funds.  Under the Insolvency Second Lien Payment Restriction, any "proceeds of Collateral" are subject to the Collateral Trust Agreement's turnover obligation.  The Collateral Trust Agreement adopts definitions from the UCC, where a term is otherwise undefined.  The UCC defined "proceeds" to

include: "[w]hatever is collected on, or distributed on account of, collateral" and also "rights arising out of collateral." N.Y. U.C.C. § 9-102(a)(64)(B) (McKinney 2001).

44.    Applicable New York law provides that the security interest attaches to the dividends received on account of the pledged equity interest. N.Y. U.C.C. § 9-315(a)(2); *see, e.g.*, *Burner v. Sec. State Bank (In re Burner)*, 109 B.R. 216 (Bankr. W.D. Tex. 1989) (addressing parallel Texas UCC provision and holding a security interest in stock attaches to cash dividends). The relevant agreements, including the pledge agreement attached as Exhibit H hereto (the "Pledge Agreement"), also describe dividends as proceeds and grant security interests in the dividends. Pledge Agreement § 1(a)(i). Accordingly, the dividends from Oncor Holdings are "proceeds of Collateral," subject to the General Second Lien Payment Restriction.

45.    Oncor Holdings paid substantial dividends both prepetition and postpetition. For example, in 2013 these dividends totaled $213 million.

46.    EFIH's other principal asset (besides Oncor Holdings equity and cash proceeds thereof)[7] is a byproduct of another aspect of the Liability Management Program. In late 2012 and early 2013, EFIH undertook additional exchange offers, issuing new *unsecured* notes in exchange for notes issued by EFH. The new unsecured notes are the $1.8 billion principal amount of so-called "PIK Notes." Relevant for this adversary proceeding is that EFIH received a large amount of notes (*bona fide* notes previously held by public investors) as an asset in the exchange. EFIH therefore currently has, as another

---

[7] The First Lien Trustee has not evaluated the causes of action, if any, held by the EFIH Debtors, whether against other affiliated debtors or other third parties in making this statement.

significant asset, $1.3 billion in principal amount of EFH notes (the "EFH Notes").  Thus, EFIH itself is the largest creditor of EFH, holding nearly two-thirds of EFH's issued debt.

47.    Following the PIK Notes exchanges, EFH made certain regular interest payments on its notes.  Prior to the Petition Date, EFIH received cash in respect of these interest payments, which, upon information and belief, was commingled with the dividend cash EFIH received from Oncor Holdings.  Neither the First Lien Trustee nor the Second Lien Trustee has a lien on the EFH Notes owned by EFIH, and thus this portion of EFIH's cash was not collateral.

48.    The "lowest intermediate balance rule" will apply to determine the portion of EFIH's cash attributable to the Collateral Trustee's security interest.  N.Y. U.C.C. § 9-315(b)(2); *see also Gen. Motors Acceptance Corp. v. Norstar Bank, N.A.*, 532 N.Y.S.2d 685 (N.Y. Sup. Ct. 1988) (holding the intermediate balance rule applies for determining the extent of "identifiable proceeds" in commingled cash); N.Y. U.C.C. § 9-315(b) Cmt. 3 ("Among the 'equitable principles' whose use other law may permit is the 'lowest intermediate balance rule.'").

49.    As of the Petition Date, EFIH reported $119 million of cash on hand.[8] Applying the lowest-intermediate-balance test, all of this cash was proceeds of Oncor Holdings dividends and was therefore collateral.

50.    Between the Petition Date and the date of the Partial Paydown, EFIH had received at least $165 million of additional Oncor Holdings dividends.[9]  Thus, based on

---

[8] *See* Energy Future Holdings Corp., Current Report (Form 8-K) 9 (EFIH DIP Budget) (Apr. 29, 2014)

[9] *See* Energy Future Intermediate Holding Company LLC, Quarterly Report (Form 10-Q) 34 (May 7, 2014)("On May 1, 2014 EFIH received a distribution of $40 million from Oncor Holdings."); Energy

publicly available financial information, there was not less than $284 million and proceeds thereof of cash collateral on hand when EFIH made the Partial Paydown.

51.     EFIH continue to receive Oncor Holdings dividends.  Upon information and belief, as of December 31, 2015, EFIH will have approximately $531 million of cash on hand that constitutes collateral.[10]

52.     These amounts are, and will be, CTA Funds both as collateral and as proceeds of collateral under the Collateral Trust Agreement.

**B.     *Partial Paydown from DIP Facility Proceeds Violated Both Second Lien Payment Restrictions Because Such Funds Constituted Both "Proceeds Resulting from a Sale of Collateral" and "Proceeds of Collateral."***

53.     The EFIH Debtors obtained a $5.4 billion superpriority postpetition priming first lien debtor-in-possession financing (the "DIP Facility") on June 19, 2014. All assets of EFIH are pledged as collateral for the DIP Facility.  EFIH has three assets: Oncor Holdings equity, cash on hand, and the EFH Notes.  Upon information and belief, the proceeds of the DIP Facility were loaned entirely, or almost entirely, on the basis of the security interest granted in the Oncor Holdings equity.

> 1.     *DIP Facility Proceeds Are "Proceeds Resulting From a Sale of Collateral," and Are Subject to the General Second Lien Payment Restriction*

54.     The General Second Lien Repayment Restriction applies to proceeds resulting from a "Sale of Collateral."  This latter term is defined to mean "any Asset Sale

---

Future Intermediate Holding Company LLC, Quarterly Report (Form 10-Q) 27 (Aug. 1, 2014) ("On July 31, 2014, EFIH received a distribution from Oncor Holdings totaling $51 million"); Energy Future Intermediate Holding Company LLC, Quarterly Report (Form 10-Q) 28 (Nov. 4, 2014) ("On October 22, 2014, [EFIH] received a distribution of $74 million from Oncor Holdings.")

[10] *See* Energy Future Holdings Corp., Current Report (Form 8-K) 9, 17 (EFIH DIP Budget) (Apr. 29, 2014).

involving a sale or other disposition of Collateral." The term "Asset Sale," in turn, has its

definition incorporated from elsewhere – the "EFIH Indenture," which is not the First

Lien Indenture or the Second Lien Indenture, but the Reference Indenture.

55.     Simple textual analysis makes clear that the defined term "Sale of

Collateral" includes secured financings. First, in the Collateral Trust Agreement itself,

"Sale of Collateral" includes not just "sales" but also "other dispositions." Furthermore,

the defined term "Asset Sale" is defined broadly in section 1.01 of the Reference

Indenture to include not just "sales" and "dispositions" but also "conveyances" and,

importantly, "transfers."

56.     The definition of "Asset Sale" encompasses secured financings. "Asset

Sale" is defined to include a "conveyance, transfer or other disposition . . . of property."

In financing transaction documents, the common meaning of the word "transfer" includes

not just sales, but also grants of collateral. For example, the term "transfer" is defined as

used in the UCC to include the grant of a security interest. *See* U.C.C. § 9-102 cmt. 26

(2014) (noting that the term "transfer" may refer to "transfer of a limited interest, such as

a security interest"); *see also* N.Y. Debt. & Cred. Law § 270; 11 U.S.C. § 101(54)(A)

(creation of lien is a transfer), (D) (every mode, "direct or indirect," of disposing of an

interest in property is a transfer). The Collateral Trust Agreement, executed

contemporaneously with the Reference Indenture, expressly defines "transfer" to have

this meaning by incorporation of the UCC definition. Collateral Trust Agreement §

1.2(a). Accordingly, based on the plain language of the definitions, an "Asset Sale"

includes secured financings, such as the DIP Facility, because the security interests granted were "transfers" of the collateral.

57.    Granting a priming security interest, as occurred under the DIP Facility, acts as a conveyance and disposition as it reduces the rights of the debtor and existing secured creditors.

2.    *DIP Facility Proceeds Are "Proceeds of Collateral," and Are Subject to the Insolvency Second Lien Payment Restriction*

58.    The UCC definition of "proceeds" includes "[w]hatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral," and also "rights arising out of collateral." N.Y. U.C.C. § 9-102 (a)(64)(A), (C).

59.    Under this UCC definition of "proceeds," cash advanced as a loan under the priming DIP Facility also constitutes "proceeds" of the collateral for the First Lien Notes for at least two reasons:  (i) the loan advances are cash "acquired upon . . . disposition of collateral" because the grant of liens to obtain proceeds of the DIP Facility are dispositions of collateral, and (ii) the proceeds of the DIP Facility loan are "rights arising out of collateral" because the liens securing the DIP Facility were conditions for the advance of the DIP Facility loan.  The definition of "proceeds" in the UCC is to be interpreted to cover expanding commercial practices, UCC § 1-102(1), (2), and to take into account the law of bankruptcy, UCC § 1-103.

60.    The DIP Facility gave priming liens and has the same effect as a sale-leaseback financing, and therefore is a "transfer," "conveyance," and/or "disposition" giving rise to proceeds.

61.     Thus, the loan proceeds advanced under the DIP Facility are subject to the
Second Lien Payment Restrictions under the Collateral Trust Agreement.

## COUNT I

### (Declaratory Judgment Regarding Partial Paydown to Second Lien Trustee and Carry-Over Liability to Future Distributions)

62.     Plaintiff restates and realleges all paragraphs set forth above, which are
incorporated by reference as if set forth in full herein.

63.     The Plaintiff is a party to, and has performed all of its obligations under,
the Collateral Trust Agreement.

64.     Computershare is a party to the Collateral Trust Agreement and subject to
the Carry-Over Provision in the Paydown Order.

65.     The following amounts currently aggregating approximately $488 million,
which as of the date of the Partial Paydown were, and remain, outstanding, whether or
not allowed against or collectible from the EFIH Debtors, constitute First Lien
Obligations subject to the Second Lien Payment Restrictions under the terms of the
Collateral Trust Agreement:

- The approximately $466.9 million First Lien Make-Whole Obligations
  or related claims for damages;

- Approximately $1.1 million in additional interest resulting from
  EFIH's failure to publicly register certain of the First Lien Notes;

- Approximately $0.6 million in interest not paid for the period from
  June 1, 2014 through June 19, 2014;

- The fees and expenses of the First Lien Trustee, including without
  limitation, fees of counsel and financial advisors to the First Lien
  Trustee; and

- Applicable interest on the foregoing amounts through the date of
  turnover and application.

66.    The Second Lien Payment Restrictions under the Collateral Trust Agreement prohibit any payment to Computershare of "proceeds resulting from" the "Sale of Collateral" or "proceeds" of "Collateral" received until the First Lien Obligations are paid in full in cash.

67.    The EFIH Debtors made the Partial Paydown to Computershare with cash then on hand, which, upon information and belief, consisted exclusively of: (i) approximately $284 million derived from dividends received from Oncor Holdings; and (ii) proceeds of the DIP Facility.  Decl. of David Ying ¶ 8, Chapter 11 Cases, D.I. 3528 ¶ 8.  All EFIH cash on hand paid to Computershare in the Partial Paydown were collateral, "proceeds resulting from" the "Sale of Collateral." and/or "proceeds" of "Collateral" that were prohibited from being paid to Computershare under the Second Lien Payment Restrictions.

68.    Section 2.4(d) of the Collateral Trust Agreement requires Computershare to hold in trust and remit to the First Lien Trustee the entirety of the Partial Paydown until the First Lien Obligations are discharged.

69.    Pursuant to the Carry-Over Provision of the Paydown Order, at the election of the First Lien Trustee, any future distributions to Computershare on account of, or in connection with, the Second Lien Notes by the EFIH Debtors will be deemed to be of the same kind, nature, and all other legally relevant characteristics, as the Partial Repayment, including the source of funds used to make the Partial Repayment.

70.    Accordingly, Plaintiff is entitled to a declaratory judgment that (i) the outstanding First Lien Obligations, as defined in and for purposes of the Collateral Trust

Agreement, consist of an amount to be proven at trial of not less than $488 million (as such amount may be further increased, whether by virtue of passage of time or changes in circumstance), including the First Lien Make-Whole Obligations, whether or not such amounts are allowed or enforceable against, or collectible from, the EFIH Debtors; (ii) the Partial Paydown paid to Computershare was made in violation of the Second Lien Payment Restrictions; (iii) Computershare was required under section 2.4(d) of the Collateral Trust Agreement to hold in trust and turn over to the First Lien Trustee the entirety of the Partial Paydown for application to outstanding First Lien Obligations until all outstanding First Lien Obligations were satisfied in full in cash; and (iv) pursuant to and in accordance with the Carry-Over Provision of the Paydown Order, Computershare, at the election of the First Lien Trustee, is required to hold in trust and remit to the First Lien Trustee all future consideration paid to Computershare on account of or in connection with the Second Lien Notes up to the amount of the Partial Repayment until all outstanding First Lien Obligations are paid in full.

## <u>COUNT II</u>

### **(Injunction Regarding Carry-Over Turnover Liability)**

71.     Plaintiff restates and realleges all paragraphs set forth above, which are incorporated by reference as if set forth in full herein.

72.     As set forth in Count I above, the entirety of the Partial Paydown was paid to Computershare in violation of the Second Lien Payment Restrictions under the Collateral Trust Agreement.

73.    Pursuant to the Carry-Over Provision of the Paydown Order, at the election of the First Lien Trustee, any future distributions to Computershare on account of or in connection with the Second Lien Notes by the EFIH Debtors will be deemed to be of the same kind, nature, and all other legally relevant characteristics, as the Partial Repayment, including the source of funds used to make the Partial Repayment.

74.    Section 2.4(d) of the Collateral Trust Agreement requires the Second Lien Trustee to hold in trust and turn over to the First Lien Trustee all amounts received in violation of the Second Lien Payment Restrictions until the First Lien Obligations are satisfied in full in cash.

75.    Upon information and belief, Computershare lacks sufficient liquid assets to satisfy any damages judgment if it is found liable for improperly distributing CTA Funds.  According to public SEC filings, Computershare N.A. had approximately $23 million of net assets as of June 30, 2014,[11] and Computershare Canada had approximately $165 million of net assets as of June 30, 2013.[12]  Accordingly, Delaware Trust will not have any adequate remedy at law with respect to Computershare.

76.    Accordingly, the First Lien Trustee is entitled to an injunction ordering that (i) pursuant to and in accordance with the Carry-Over Provision of the Paydown Order, Computershare, at the election of the First Lien Trustee, shall hold in trust and remit to the First Lien Trustee all future consideration paid to Computershare on account of or in connection with the Second Lien Notes up to the amount of the Partial

[11] Computershare Trust Company, National Association, Statement of Eligibility (Form T-1) (Sept. 15, 2014)

[12] Computershare Trust Company of Canada, Statement of Eligibility (Form T-1) (Aug. 29, 2013)

Repayment until all outstanding First Lien Obligations are paid in full; and

(ii) Computershare shall be permanently enjoined from distributing to the Second Lien Holders any future consideration received, including under any chapter 11 plan, on account of or in connection with the Second Lien Notes until the outstanding First Lien Obligations are paid in full.

WHEREFORE, Plaintiff demands that judgment be entered in its favor and against the Defendants, as follows:

A.      for declaratory relief that: that (i) the outstanding First Lien Obligations, as defined in and for purposes of the Collateral Trust Agreement, consist of an amount to be proven at trial of not less than $488 million (as such amount may be further increased, whether by virtue of passage of time or changes in circumstance), including the First Lien Make-Whole Obligations, whether or not such amounts are allowed or enforceable against, or collectible from, the EFIH Debtors; (ii) the Partial Paydown paid to Computershare was made in violation of the Second Lien Payment Restrictions; (iii) Computershare was required under section 2.4(d) of the Collateral Trust Agreement to hold in trust and turn over to the First Lien Trustee the entirety of the Partial Paydown for application to outstanding First Lien Obligations until all outstanding First Lien Obligations were satisfied in full in cash; and (iv) pursuant to and in accordance with the Carry-Over Provision of the Paydown Order, Computershare, at the election of the First Lien Trustee, is required to hold in trust and remit to

the First Lien Trustee all future consideration paid to Computershare on account of or in connection with the Second Lien Notes up to the amount of the Partial Repayment until all outstanding First Lien Obligations are paid in full;

B.    for injunctive relief ordering that (i) pursuant to and in accordance with the Carry-Over Provision of the Paydown Order, Computershare, at the election of the First Lien Trustee, shall hold in trust and remit to the First Lien Trustee all future consideration paid to Computershare on account of or in connection with the Second Lien Notes up to the amount of the Partial Repayment until all outstanding First Lien Obligations are paid in full; and (ii) Computershare shall be permanently enjoined from distributing to the Second Lien Holders any future consideration received, including under any chapter 11 plan, on account of or in connection with the Second Lien Notes until the outstanding First Lien Obligations are paid in full; and

C.    Granting the Plaintiff such other and further relief as the Court deems just and appropriate.

Dated:  March 31, 2015

COLE SCHOTZ P.C.

/s/ Norman L. Pernick
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: 302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

Warren A. Usatine
25 Main Street,
P.O. Box 800
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com

    --and--

ROPES & GRAY LLP
Keith H. Wofford
Mark R. Somerstein
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: 212-596-9000
Facsimile:  212-596-9090
Keith.Wofford@ropesgray.com
Mark.Somerstein@ropesgray.com

D. Ross Martin
Andrew G. Devore
Joshua Y. Sturm
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com
Joshua.Sturm@ropesgray.com

*Counsel for Delaware Trust Company of Delaware,
as successor indenture trustee and collateral trustee*

    --and--

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:   212-248-3141
James.Millar@dbr.com

*Counsel for Delaware Trust Company of Delaware,
as successor indenture trustee*