**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>ENERGY FUTURE<br>HOLDINGS CORP., *et al.*,<br><br>      *Debtors.* | Chapter 11<br><br>Case No. 14-10979 (CSS)<br><br>(Jointly Administered)<br><br>**Objection Deadline: May 29, 2014 at 4:00 p.m.**<br>**Hearing Date: June 5, 2014 at 9:30 a.m.** |

**JOINT MOTION OF CSC TRUST COMPANY OF DELAWARE,**
**AS INDENTURE TRUSTEE, AND CERTAIN EFIH 10% FIRST LIEN**
**NOTEHOLDERS, FOR CONFIRMATION THAT THE AUTOMATIC**
**STAY DOES NOT APPLY OR, ALTERNATIVELY, FOR**
**LIMITED RELIEF FROM THE AUTOMATIC STAY,**
**SOLELY REGARDING RESCISSION OF ACCELERATION**

CSC Trust Company of Delaware, as indenture trustee (the "10% Indenture

Trustee")[1] under that certain indenture dated as of August 17, 2010 (as amended or

supplemented, the "10% Indenture") by and among Energy Future Intermediate Holding

Company LLC ("EFIH LLC"), EFIH Finance Inc. ("EFIH Finance" and, together with

EFIH LLC, "EFIH"), and the Bank of New York Mellon Trust Company, N.A., as former

indenture trustee pursuant to which EFIH issued those certain 10% Senior Secured Notes

due 2020 (the "10% Notes"), and the undersigned holders of first lien 10% Notes (the

---

[1] The 10% Indenture Trustee files this Motion at the written direction of holders with a majority in
principal amount of the 10% Notes (including each of the EFIH First Lien Noteholders (as defined below)).
CSC Trust is also the indenture trustee for the approximately $502.7 million in principal amount of 6.875%
first lien notes due 2017 issued under that certain indenture dated August 14, 2012 between EFIH and CSC
Trust, as successor indenture trustee (the "6.875% Indenture").  Although CSC Trust has not been directed
by a majority of holders of the 6.875% notes, the 10% Indenture and the 6.875% Indenture are
substantively identical with respect to the issues raised by this Motion (except for the amount of the
Applicable Premium).

"EFIH 10% First Lien Noteholders"),[2] by and through their undersigned counsel, hereby submit this motion (the "Motion") for (i) confirmation that the automatic stay does not apply to the delivery of notice to the 10% Indenture Trustee by a majority of holders of the 10% Notes rescinding acceleration of the 10% Notes and its consequences, as provided for in Sections 6.02 and 6.04 of the 10% Indenture,[3] and (ii) in the alternative, granting relief from the automatic stay for a majority of holders to deliver such notice.  In support of this Motion, the 10% Indenture Trustee and the EFIH 10% First Lien Noteholders submit the Declaration of Norman L. Pernick (the "Declaration")[4] and respectfully represent and set forth as follows:

## PRELIMINARY STATEMENT

1.        Pursuant to the 10% Indenture, EFIH issued $3.482 billion of first lien 10% Notes.  One of the most fundamental contractual terms of the 10% Notes is the call protection that EFIH agreed, in the form of redemption premiums (defined as the "Applicable Premium" in the 10% Indenture).  The 10% Indenture states that this redemption premium is payable upon any redemption of the 10% Note prior to specific

---

[2] The EFIH 10% First Lien Noteholders consist of: BlueMountain Capital Management, LLC, as investment manager; Cyrus Opportunities Master Fund II, Ltd.; Crescent I, L.P.; CRS Fund, Ltd.; Cyrus Select Opportunities Master Fund, Ltd.; Cyrus Special Strategies Master Fund, LP; Cyrus Heartland, L.P.; Cyrus Lightyear Fund, L.P.; Gryphon Hidden Values VIII Limited; Halcyon Mac 19 Ltd.; Halcyon Master Fund L.P.; Halcyon Mount Bonnell Fund LP; Halcyon Restructuring Fund II Master LP; HCN LP; HL FLP; HLTS Fund II LP; Luxor Capital Group, LP; Owl Creek I, L.P.; Owl Creek II, L.P.; Owl Creek Credit Opportunities Master Fund, L.P.; Owl Creek Overseas Master Fund, Ltd.; Owl Creek SRI Master Fund, Ltd.; Southpaw Credit Opportunity Master Fund LP; VR Advisory Services Ltd. it is capacity as advisor to VR Global Partners, L.P.; and Wilshire Institutional Master II SPC on behalf of Wilshire Halcyon Multi Strategy Segregated Portfolio.

[3] Each of the EFIH 10% First Lien Noteholders are prepared to deliver a notice of rescission of acceleration.

[4] The Declaration includes the original 10% Indenture dated August 17, 2010 as Exhibit A, the first supplemental indenture dated January 29, 2013 as Exhibit B, the Collateral Trust Agreement as Exhibit C, and the Pledge Agreement as Exhibit D.

dates, not merely to payments "prior to maturity."  Nonetheless, EFIH and its junior

creditors seek to effect a redemption at the outset of these cases without paying this

premium, even though it is beyond dispute that the date upon which a premium-free

redemption may occur under the governing agreements has not yet occurred.  The

applicable redemption premium due under the terms of the 10% Indenture, if EFIH is

granted its requested relief, is approximately $665.2 million.[5]

2.        In the months leading up to the filing of these bankruptcy cases, EFIH

actively sought debtor-in-possession financing.  EFIH was not seeking any financing for

operations, because it has none.  Instead, the DIP facility was sought for the purpose of

attempting through these bankruptcy cases to accomplish what EFIH could not do outside

of bankruptcy – refinance the 10% Notes at lower interest rates without the required

payment of the redemption premium.  The mere act of filing a bankruptcy petition does

not, however, entitle EFIH – and more accurately, its junior creditors – to a $665 million

windfall.

3.        The 10% Indenture requires the payment of the redemption premium if the

10% Notes are redeemed prior to December 1, 2015.

> At any time prior to December 1, 2015, the Issuer may
> redeem all or a part of the Notes at a redemption price
> equal to 100% of the principal amount of the Notes
> redeemed plus the Applicable Premium as of, and accrued
> and unpaid interest to, the date of redemption (the
> "Redemption Date"), subject to the right of Holders of
> Notes of record on the relevant Record Date to receive
> interest due on the relevant Interest Payment Date.

---

[5] The calculation of the Applicable Premium assumes a redemption date of June 6, 2014.

10% Indenture § 3.07(a).  Contemporaneous with the filing of this Motion, the 10%

Indenture Trustee has filed a complaint (the "Complaint") seeking a declaratory judgment

that the 10% Indenture requires the payment of the redemption premium upon the

consummation of the refinancing transaction that the Debtors have proposed.  Further, to

the extent that EFIH or any other constituency may argue that the 10% Indenture is

ambiguous on this point, any such ambiguity must be construed against EFIH as drafter

of the 10% Indenture, and thus the redemption premium is still payable when the

redemption funded by the DIP occurs.  *See, e.g.*, *Columbia Gas Sys., Inc. v. United

States*, 473 F.2d 1244, 1248-49 (2d Cir. 1973).

4.    Despite the plain language of the 10% Indenture, EFIH and junior creditor

constituencies have stated their position that acceleration of the notes upon bankruptcy

divests the 10% Indenture Trustee of its contractual entitlement, on behalf of the holders

of the 10% Notes, to the redemption premium.  This runs directly counter to several of

the most fundamental rules of bankruptcy: that claims broadly include all rights as of the

petition date, including contingent and unmatured rights; that state-law determines the

allowable amount of claims (except in very limited circumstances set forth in section

502(b)); and that the contractual rights of oversecured creditors are, if anything, entitled

to greater protection because of Constitutional concerns.  Indeed, the Debtors base their

theory of premium denial on cases where the indentures (and the creditors' corresponding

claim rights) were inferior to those here — in those cases, the indentures either expressly

provided that the premium was not payable upon a filing of bankruptcy (*In re AMR

Corp.*); or the indenture did not even provide for a redemption premium, and instead

involved arguments for expectation damages based on an unwritten "implied" no-call protection (*In re Solutia*).

5.      Unlike in any other reported decision regarding redemption premiums or no-calls, the 10% Indenture here grants the majority noteholders a contractual right to "rescind any acceleration and its consequences."[6]  Even if EFIH had the right to repay the 10% Notes without the redemption premium upon a bankruptcy acceleration, any such right is subject to this rescission right of the majority holders.[7]

6.      To be clear, this Motion is essentially protective.  First, the 10% Indenture requires payment of the redemption premium under these circumstances regardless of acceleration or rescission of acceleration.  Second, because the aforementioned fundamental rules of bankruptcy law give the 10% Indenture Trustee its claim, the stay is not determinative of the claims allowance issue.  This Motion seeks appropriate relief, in the manner that bankruptcy courts prefer (i.e., asking for a ruling that the stay does not apply, rather than self-help, and for stay relief if the stay applies), to the extent that this Court believes that some action is  required with respect to the 10% Indenture Trustee's claim.  Absent the two prior decisions (which EFIH is likely to rely upon) containing dicta that purports to establish that the automatic stay applies to rescission notices, this Motion would be unnecessary.

---

[6] 10% Indenture §§ 6.02, 6.04.

[7] *See* 11 U.S.C. § 101(5) (expansively defining "claim" to include any "right to payment, whether or not such right is . . . fixed, contingent, matured, unmatured, disputed, [or] undisputed."); *In re Rodriguez*, 629 F.3d 136, 142 (3d Cir. 2010) ("[T]he contingent nature of the right to payment does not change the fact that the right to payment exists, even if it is remote, and thereby constitutes a 'claim' for purposes of § 101(5).").

7.      The automatic stay does not apply to the mere sending of a notice of rescission of acceleration, because such an action is not a collection action prohibited by the automatic stay.  Nevertheless, out of an abundance of caution and to avoid any suggestion of delay, the 10% Indenture Trustee and the EFIH 10% First Lien Noteholders file this motion for confirmation that the automatic stay does not bar the delivery of a notice of rescission of acceleration, or, in the alternative, for relief from the automatic stay to deliver notice to the 10% Indenture Trustee of rescission of acceleration.

## BACKGROUND

8.      In two separate issuances in 2010 and 2013, EFIH issued $3,482,106,000 aggregate principal amount in 10% Notes pursuant to the 10% Indenture.[8]  Both the 10% Notes and the 10% Indenture require the payment of a redemption premium (the "Applicable Premium") if EFIH redeems the 10% Notes prior to the specified date of December 1, 2015:

> At any time prior to December 1, 2015, the Issuer may redeem all or a part of the Notes at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of and accrued and unpaid interest to, the date of redemption (the "Redemption Date"), subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date.

10% Notes ¶ 5(b); 10% Indenture § 4.01.

9.      The 10% Notes and the 10% Indenture both contemplate payment of a redemption premium after acceleration.  The 10% Notes provide that "[i]f any Event of

---

[8] EFIH issued $2,180,000,000 of principal amount of 10% Notes on or about August 17, 2010, and $1,302,106,000 of principal amount of 10% Notes on or about January 29, 2013.

Default occurs and is continuing, the Trustee or [30% of Holders] may declare principal,

premium, if any, interest and any other monetary obligations on all of the then

outstanding Notes to be due and payable immediately," and that upon a bankruptcy

default "all outstanding Notes shall be due and payable immediately."  10% Notes ¶ 12.

The 10% Indenture provides the same at Section 6.02.

10.     The 10% Indenture and 10% Notes permit a majority of holders to rescind

any acceleration, including an automatic acceleration, and its consequences:

> The Holders of at least a majority in aggregate principal
> amount of the Notes by written notice to the Trustee may
> . . . rescind any acceleration with respect to the Notes and
> its consequences (so long as such rescission would not
> conflict with any judgment of a court of competent
> jurisdiction).

10% Indenture § 6.02.

11.     EFIH granted first priority liens to secure the 10% Notes, including the

obligation to pay the redemption premium.  *See* Collateral Trust Agreement § 1.1

(defining "Obligations" to include "premium, penalties fees . . . and other liabilities . . .

payable under the documentation governing any indebtedness").  EFIH LLC is a holding

company with no operations.  The collateral securing the 10% Notes consists of a pledge

of EFIH LLC's majority ownership interest in Oncor Electric Delivery Holdings

Company LLC (together with its direct and indirect subsidiaries, "Oncor"), dividends on

such interest, and the proceeds thereof.  *See* Pledge Agreement § 1.  This lien includes

post-petition dividends, as the prepetition lien extends to proceeds, pursuant to

Bankruptcy Code section 552.

12.     EFIH is seeking debtor-in-possession financing for the purpose of redeeming the 10% Notes.  EFIH did not seek any financing for operations; the loan proceeds will instead be used to redeem the 10% Notes and other first lien notes, pay transaction costs, interest to junior lien creditors, management overhead, professional fees, and miscellaneous costs of the bankruptcy case.  The bankruptcy filing of EFIH appears designed to attempt to escape EFIH's obligations to pay the secured redemption premium, for the benefit of unsecured bondholders.  The first major item of business in the EFIH chapter 11 case is to engage in a financing to fund a redemption, while attempting to evade payment of the redemption premium.

## JURISDICTION

13.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b).  The statutory predicates for the relief sought herein are sections 105(a) and 362(d) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").  The 10% Indenture Trustee and the EFIH 10% First Lien Noteholders consent to the entry of final judgment by the bankruptcy court regarding the relief sought herein.

## RELIEF REQUESTED

14.     By this Motion, the 10% Indenture Trustee and the EFIH 10% First Lien Noteholders seeks entry of an order (i) confirming that the automatic stay does not apply to the delivery of a rescission notice to the 10% Indenture Trustee by a majority of

holders of the 10% Notes, and (ii) in the alternative, granting relief from the automatic

stay for delivery of such notice.

## BASIS FOR RELIEF

I.  **THE TRUSTEE'S AND NOTEHOLDERS' CONTRACTUAL ENTITLEMENTS, AND NOT THE AUTOMATIC STAY, GOVERN THE SIZE AND AMOUNT OF FIRST LIEN CLAIMS**

15.    Each of the reported cases addressing redemption premiums in bankruptcy

focuses on the plain language of the particular indentures in question.  *See, e.g.*, *In re*

*School Specialty, Inc.*, 2013 Bankr. LEXIS 1897, No. 13-10125 (Bankr. D. Del. Apr. 22,

2013) (allowing claim for redemption premium payable upon prepayment or

acceleration); *U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88,

94 (2d Cir. 2013) (denying redemption premium where indenture expressly excluded

redemption premium upon acceleration); *In re Solutia Inc.*, 379 B.R. 473, 488-89 (Bankr.

S.D.N.Y. 2007) (denying implied no-call damages where indenture did not contain a no-

call provision, and holding that the rescission of acceleration clause could not apply).

16.    The 10% Indenture Trustee is an oversecured creditor whose prepetition

claim rights include a contingent and unmatured right to payment upon the redemption

transaction that EFIH is engaging in here.  As set forth in the 10% Indenture Trustee's

adversary proceeding commenced contemporaneously herewith, the redemption premium

is simply part of the prepetition claim, since the redemption contingency is actually

occurring.

17.    However, to the extent that the Court considers actual rescission of

acceleration to be necessary to crystallize or liquidate such claim, the EFIH 10% First

Lien Noteholders are prepared to do so.  To avoid any suggestion of delay (as has occurred in other cases), or allegation of unilateral action, the 10% Indenture Trustee and the EFIH 10% First Lien Noteholders seek confirmation that the automatic stay does not apply to the sending of notices to rescind acceleration.  *See, e.g.*, *In re Christen/Montenay Energy Co.*, 902 F.2d 1098, 1104 (2d Cir. 1990) (stating that a creditor with a good faith belief that the automatic stay did not apply "should have sought the advice of the bankruptcy court as to the applicability of the automatic stay").  Even if this Court believes that the stay applies, cause exists to lift the stay in order to permit assertion of this oversecured claim for the redemption premium.  This is especially so in this particular case, where the first major action is to engage in a redemption transaction, and a purpose of the filing of the chapter 11 case is to try to deny the redemption premium.

18.    Two cases from outside of this Circuit have stated that the automatic stay applies to sending a notice of rescission of acceleration.  *See AMR*, 730 F.3d at 102-03; *Solutia*, 379 B.R. at 484-85.  Those cases should not be followed here.  It is not clear that either of the indentures in question would have permitted rescission of the bankruptcy acceleration.  More importantly, the most fundamental tenets of bankruptcy undermine the conclusion of those courts that "the stay freezes the claim."  The principal statutory text on which *Solutia* relied, and on which *AMR* relied, leads directly to the opposite conclusion of those opinions.

19.    The *AMR* and *Solutia* courts also concluded that relief from the automatic stay was not warranted – but in each case, the holders waited until late in the bankruptcy case to seek to rescind acceleration.  *AMR*, 730 F.3d at 112 n.23 (noting that the motion

for relief was filed over a year after the bankruptcy filing); *Solutia*, 379 B.R. at 484 n.7

(oral motion seeking retroactive stay relief was untimely after nearly four years into the

case).  This chapter 11 case, by contrast, begins with a multi-billion-dollar refinancing

and redemption transaction, and a timely motion for determination that the stay does not

apply (or alternatively for relief from the stay).

## II.    THE AUTOMATIC STAY DOES NOT PREVENT RESCISSION OF ACCELERATION

20.     "The purpose of the automatic stay is to afford the debtor a 'breathing

spell' by halting the collection process."  *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90,

100 (3d Cir. 2008).  Accordingly, "the automatic stay operates to halt collection of pre-

petition claims."  *In re Rodriguez*, 629 F.3d 136, 141-42 (3d Cir. 2010).

### A.    <u>Section 362(a)(6) Does Not Bar Rescission of Acceleration</u>

21.     The principal provision of the automatic stay supposedly preventing

deceleration in this circumstance is the word "assess" in section 362(a)(6), although only

two courts have addressed the issue.  Section 362(a)(6) stays "any act to <u>collect, assess,</u>

<u>or recover</u> a claim against the debtor that arose before the commencement of the case."

(emphasis added).  *See Solutia*, 379 B.R. at 485 & n.8; *U.S. Bank Trust Nat'l Ass'n v.*

*AMR Corp. (In re AMR Corp.)*, 485 B.R. 279, 294 (Bankr. S.D.N.Y. 2013) (relying on

*Solutia*), *aff'd* 730 F.3d 88 (2d Cir. 2013).

22.     The word "assess," as used in section 362(a)(6), cannot simply mean as

the court in *Solutia* concluded, to "determine the size or value of something."  379 B.R. at

485 n.8.  If that was the proper reading of the statute, then even filing a proof of claim

calculating the amount owed on a contract would violate the automatic stay.  As a court

in this Circuit has stated: "Section 362(a)(6) cannot, consistent with other sections of the

Bankruptcy Code, interfere within the calculation of debts owed, the preparation of offers

of proof, or the issuance of a notice of tax liability."  *See, e.g.*, *In re Fasgo, Inc.*, No. 86–

1995, 1986 WL 10817, at *4 (E.D. Pa. Sept. 30, 1986).

**B.      Section 362(a)(6)'s Stay of "Actions to Assess" a Prepetition Claim (i) Refers to Collection Actions, not Actions Computing, Fixing or Crystalizing a Contingent Claim, and (ii) Specifically Pertains to Tax Claims.**

1.      *"Assess" Means Collection of a Claim, Not Computation of a Claim, or Fixing or Crystalizing a Contingent Claim*

23.      The plain language of section 362(a)(6) text makes clear that "assess"

refers to collection-like activity.  The word "assess" does not sit in a vacuum; it sits in

context.  That context is a list of stayed actions – "collect, assess or recover" a claim –

that demonstrate the Third Circuit's point in the *Rodriguez* and *Schaefer Salt Recovery*

cases.  First, fundamental canons of statutory interpretation dictate that a word that could

have a broad or "general" meaning, when found in a list of specific words, is read

narrowly with its meaning illuminated by the surrounding words.  *See, e.g., Bullock v.*

*BankChampaign, N.A.*, 133 S.Ct. 1754, 1760 (2013) (applying *ejusdem generis* to a

statutory list of terms in the Bankruptcy Code).  Courts frequently invoke this canon

when interpreting the Bankruptcy Code.  *See, e.g., id.; RadLAX Gateway Hotel v.*

*Amalgamated Bank*, 132 S. Ct. 2065 (2012); *Official Comm. Of Unsecured Creditors ex*

*rel Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548, 578 (3d Cir.

2003).  Second, the entirety of section 362(a) concerns itself with collection actions, not

the determination of claims (contingent or otherwise), and that positioning within the

statute informs the meaning. *See, e.g., Bullock*, 133 S. Ct. at 1760 (also invoking

*noscitur a sociis*); *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252,

258 (3d Cir. 2000) (same).

24.     Thus the cases that analyze the issue with rigor all come to the same

answer.  "[T]he mere calculation of additional charges in computing the Debtor's loan

obligations does not violate the stay." *Shirns Pontiac GMC, Inc. v. Susquehanna Bank*

*(In re Shirns Pontiac GMC, Inc.)*, No. 5–08–bk–53252, 2010 WL 3928532, at *1 (Bankr.

M.D. Pa. Oct. 4, 2010).  "The use of 'collect' and 'recover' alongside 'assess' . . .

evidences that 'assess' implies something more than the fixing or determining of an

amount due." *In re Hartman*, 110 B.R. 951, 955 (Bankr. D. Kan. 1990).  *See Fasgo*,

1986 WL 10817, at *4 ("'Assess' as used by § 362(a)(6) concerns the imposition or

levying of liability upon, or the collection of liability from, the debtor.  This conclusion is

supported by the fact that the term in question is used in conjunction with the terms

'collect' and 'recover.'  . . .  Thus, the section prohibits the levying of liabilities or

extraction of assets."); *In re Northwest Automatic Prods, Inc.*, Nos. 4-86-2366, 4-86-2365,

1989 WL 4477, at *2 (Bankr. D. Minn. Jan. 23, 1989) (same); *In re The Original*

*Barefoot Floors of America, Inc.*, 412 B.R. 769, 773 (Bankr. E.D. Va. 2008) ("Under the

plain language of [section 362(a)(6)], if an act is not designed or intended to collect a

debt, it does not fall within the reach of the automatic stay . . . .").

25.     These judicial opinions are entirely reinforced by a key House Committee

Report issued in connection with enactment of the Bankruptcy Code:

> Paragraph (6) prevents creditors <u>from attempting in any</u>
> <u>way to collect a prepetition debt</u>. Creditors in consumer

> cases occasionally telephone debtors to encourage
> repayment in spite of bankruptcy. Inexperienced,
> frightened, or ill-counseled debtors may succumb to
> suggestions to repay notwithstanding their bankruptcy. This
> provision prevents evasion of the purpose of the bankruptcy
> laws by sophisticated creditors.

H.R. REP. NO. 95-595, at 342 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6298

(emphasis added).

26.     By sending the notices of rescission, the majority holders would not in any

way attempt to "collect" the redemption premiums.  The 10% Indenture Trustee's

contract rights include the right to rescind any acceleration, and thus the value of those

rights are already included in the contingent portion of the proof of claim.  All a

rescission would specifically accomplish is to make clear that the contingency may still

in fact occur – allowing there to be a subsequent fixing, crystalizing or calculation of the

claim.  None of the EFIH 10% First Lien Holders, the 10% Indenture Trustee or the

Collateral Agent (as defined in the Collateral Trust Agreement) are seeking to extract

assets from the estate.[9]  They simply may have an oversecured claim for the redemption

premium when a redemption occurs.  The mere potential increase in the amount of a

claim due to a contingency is not a concern of the automatic stay.  As perhaps the

simplest example of this principle, even an unsecured claim, if contractually entitled to

collection costs, has an allowable contingent and unmatured claim for collection costs

incurred in the bankruptcy case.  *See, e.g., Ogle v. Fid. & Deposit Co. of Md.*, 586 F.3d

143, 146 (2d Cir. 2009) (citing *Travelers Casualty & Surety Co. of America v. Pacific*

---

[9] It is notable, and ironic, that the EFIH Debtors would seek to characterize rescission, which delays the
date that debt is due, as an act to "collect" that debt.

*Gas & Elec. Co.*, 549 U.S. 443 (2007)).  The action of the creditor in actually incurring the fees, thus fixing and crystalizing the contingency, sets the amount of the claim, but the action itself is not barred by the automatic stay.

27.     The Bankruptcy Code itself recognizes that contingencies crystalize after the petition date and that in such circumstances, the full claim is allowed.  *In re Transworld Air Lines*, 275 B.R. 712, 723-24 (Bankr. D. Del. 2002).  The same principle is at work in section 502(c), which authorizes estimation of contingent claims, but only if the "fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."  Accordingly, there are contingencies which occur soon enough in a case such that there is not even a need to estimate the claim.  Thus, contingencies occurring after a case commence simply affect the allowed amount of the claim.

28.     The Debtors will be able to propose a treatment for the oversecured claim for redemption prepaid in any plan, or may seek to pay the claim in cash earlier (as they are proposing to do with the principal and interest) to avoid the accrual of contractual post-petition interest.  Any "collection" of the redemption premium would thus be pursuant to the plan process, or upon a refinancing if EFIH so chooses rather than being accomplished by a rescission.

        2.     *An "Assessment" Under Section 362(a)(6) Refers to Collection of Taxes*

29.     The EFIH Debtors might respond that, under basic rules of statutory construction, "assess" must mean something more than "collect" and "recover," and that interpreting "assess" in the foregoing manner would make that term "mere surplussage."

But such an approach ignores the functional distinction that Congress was making in this section.  "Assess" appears in section 362(a)(6) for a very specific reason – the word is used there as a tax collection concept.   This is conclusively demonstrated in two ways.

30.    First, the Bankruptcy Code generally uses the word "assess" in referring to taxation in section 362 and elsewhere.  Each other use of the word "assess" in section 362 is expressly in the context of taxation:

> -- § 362(b)(9)(D), which exempts from the automatic stay "the making of an <u>assessment for any tax</u> and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor)."

> -- § 362(b)(18), which exempts from the automatic stay "under subsection (a) of the creation or perfection of a statutory lien <u>for an ad valorem property tax, or a special tax or special assessment on real property</u> whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition."

The tax-related usage of "assess" is employed in seventeen other sections of the Bankruptcy Code:

- 501(e) ("<u>for fuel use tax assessed</u>**")**.

- 502(b)(3) ("if such claim is <u>for a tax assessed</u> against property of the estate");

- 505(a)(1) ("court may determine the amount or legality of any tax . . . whether or not previously assessed")

- 505(c) ("the governmental unit charged with responsibility for collection of such tax may assess such tax");

- 902(3) ("against which a special assessment or special tax has been levied");

- 902(4) ("the plan proposes to increase the proportion of special assessments or special taxes").

All of those usages except two involve imposition of government tax claims or tax-like revenue-raising claims.  11 U.S.C. §§ 110(k)(2) (court imposed fines), 501(e) (tax); (505(a)(1) (tax); 505(c) (tax); 507(a)(2) (court fees), 507(a)(8)(A)(ii) (tax), 507(a)(8)(A)(iii) (tax), 507(a)(8)(F)(iii) (antidumping duties), 902(3) (tax), 902(4) (tax), 921(a) (special assessment district), 922(a)(2) (taxes), 928(b) (municipal betterment assessments).  The last three usages of "assess" involve situations so specialized that the context makes clear they provides no guidance for the meaning elsewhere.  11 U.S.C. §§ 523(a)(16) (condominium and cooperative apartment fees), 523(a)(17) (prisoner litigation fees); 707(b)(4) (Rule 9011 sanctions).  *See also Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning.'") (citation omitted).  "An 'assessment' of taxes is a formal, discrete act with specific legal consequences . . . . Even though the term may be used in the Bankruptcy Code, it is specifically used in reference to taxes and its meaning must be a function of that context.  Recognizing the difficulty of defining 'assessment' so as to encompass all possible tax procedures of federal, state, and local governmental units, Congress employed a common term of tax lexicon and left its peculiar meaning to depend upon the particular tax

procedures." *Hartman v. U.S. (In re Hartman)*, 110 B.R. 951, 955-96 (D. Kan. 1990). By far, the near-exclusive use of "assess" in the Bankruptcy Code connotes tax assessments.

31.    There is further direct evidence that Congress placed the word "assess" in section 362(a)(6) specifically to solve tax-related issues.  The original language of section 362(a)(6) in H.R. 8200, which eventually culminated in the Bankruptcy Reform Act of 1978 (the "Bankruptcy Reform Act"), only stayed "any act to collect or recover a claim," and did not include the word "assess."  *See* Bankruptcy Reform Act of 1978, H.R. 8200, 95th Cong. § 101, at 52 (1st Sess. 1977).  "Assess" was specifically added to the statutory language in an amendment that also added a new section 362(a)(8), which stays the specialized proceedings in the United States Tax Court, which might not otherwise be captured by the provisions of 362.  *See* 95 Cong. Rec. H11, 053 (daily ed. Sept. 28, 1978) (House amendment to H.R. 8200).  These tandem changes to section 362(a) remove any doubt that Congress added "assess" to section 362(a)(6) to prohibit conduct of taxing authorities.  Corresponding contemporaneous evidence exists from the Senate in the form of floor remarks from the lead Senate manager of the Bankruptcy Reform Act.  The addition of the word "assess" in section 362(a)(6) is discussed in a lengthy explanation of a host of changes to the Bankruptcy Code addressing the interplay of bankruptcy procedure and tax procedure.  *See* 95 Cong. Rec. S17,428 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini) ("As indicated above, the commencement of a bankruptcy case automatically stays assessment of any tax (sec. 362(a)(6)).").

32.     The act of "assessment" of federal income taxes (which appears to have

been at the forefront of Congress's thoughts) has a very specific meaning that does not fit

neatly within any other category of the actions stayed under section 362.

33.     The act of assessment is the formal act of making an entry on the books

and records of the U.S. Government that a tax is owed.  *LA Dept. of Revenue & Tax. v.*

*Lewis (In re Lewis)*, 199 F.3d 249, 252 & n.13 (5th Cir. 2000); *Maali v. United States (In*

*re Maali)*, 432 B.R. 348, 352 (B.A.P. 1st Cir. 2010); *In re O'Connell*, 246 B.R. 332, 334

(B.A.P. 8th Cir. 2000).  But it is also far more than a bookkeeping entry.  The assessment

is not the mere IRS calculation of what is owed and notice to the taxpayer of a dispute –

that is an "audit" and/or "notice of deficiency," procedural steps that are expressly not

barred by the automatic stay.  11 U.S.C. § 362(b)(9).  Rather, the assessment begins both

the process of collection and the existence of a tax lien.  The IRS sends a separate "notice

of demand for payment" that gives rise to the tax lien, which "relates back" to the date of

assessment.  The act of assessment has legal significance, but it is not a typical act to

collect or recover, or the granting of a lien.  Thus, Congress inserted the tax-procedure-

specific term "assess" into section 362(a)(6).

> 3.     Solutia *Incorrectly Analyzed the Issue of Stay Applicability, and*
> AMR *Regrettably Relied on the Conclusion in* Solutia

34.     The foregoing statutory language and history was not discussed in either

the *Solutia* or *AMR* opinions, and there was little or no briefing on these issues.  The

*Solutia* opinion was the genesis of the theory that rescission of acceleration would violate

the stay but the legal analysis (in the *Solutia* opinion) is limited.  *Solutia* looked for a

definition of "assess" in Black's Law Dictionary, found none, and then went on to cite

the <u>fourth</u> definition in an online dictionary.[10]  However, even that online dictionary cited in *Solutia* includes <u>three prior meanings of "assess", which all specifically relate to taxes</u> – not some generalized "determin[ation] of importance, size or value."  *Websters Online Dictionary.*  It is fair to say that the *Solutia* analysis gave at most short shrift to the history and context of the inclusion of "assess" by Congress.

35.    The *Solutia* opinion also purports to rely on *Manville Forest Products Corp.*, 43 B.R. 293 (Bankr. S.D.N.Y. 1984), for its analysis regarding the automatic stay. Fundamentally, *Manville* concerns a different issue: whether acceleration (not deceleration) was even necessary to assert an unmatured claim, and commented in *dictum* that acceleration would have violated the stay.  The *Solutia* opinion appears to conclude that *Manville* relied on sections 362(a)(3), (4) and (5).  But *Manville* made no mention of any of those sections of the automatic stay; and the issue of secured status (which is a requirement of sections 362(a)(4) and (5)) was not relevant in *Manville.*  43 B.R. at 296 ("For purposes of resolving this dispute the long-term lenders do not seek a determination based upon the secured or unsecured status of their claims.").  Thus the *Manville* opinion relied only on section 362(a)(6), even for its dictum.

---

[10] The relevant passage from *Solutia* is very short, and only in a footnote:

> The word "assess" is not defined in the Bankruptcy Code nor can a definition be found in *Black's Law Dictionary* (8th Ed.).  Since the word is one without a specific legal meaning, this court finds that as used in Code § 362(a)(6) assess is a word of general meaning. While one meaning of the word is to fix the tax rate on property, the word also can mean to simply determine the size or value of something. *See Merriam-Webster Online Dictionary*, "assess", definition (4).

379 B.R. at 485 n.8.

36.    Lastly, the discussion of applying the stay to rescission in *Solutia* was dictum as well.  The bankruptcy court began its analysis regarding rescission by finding that the *Solutia* indenture did not, as a matter of contract, permit rescission of a bankruptcy acceleration.  379 B.R. at 483 ("As the Original Indenture is drafted, it does not appear to this court that the 2009 Noteholders can undo an automatic acceleration . . . but it may be that the language of the section is simply difficult to parse.").  In contrast to the Indenture here, which permits a bankruptcy acceleration to be rescinded, the Solutia indenture contained no such right.

**C.    None of Sections 362(a)(3), (a)(4) or (a)(5) Stay a Rescission of Acceleration**

37.    The Second Circuit opinion in *AMR* cited *Manville* for a proposition that invokes sections 362(a)(3), (4) and (5).  The *AMR* citation to *Manville* uses ellipses to remove the key part of the relevant sentence from Judge Lifland's opinion.  *AMR*, 730 F.3d at 103.  Judge Lifland actually stated that acceleration of the debt was entirely unnecessary and that an unmatured claim based on postpetition events must be paid, absent a reinstatement in a full reorganization plan.  *Manville* actually says that claims maturing post-petition are allowable.  That is a central point made in the 10% Indenture Trustee's Complaint in this case, and is in fact the law in this Circuit.  *In re Oakwood Homes Corp.*, 449 F.3d 588, 601-03 & nn.17-19 (3d Cir. 2006).

38.    Sections 362(a)(3), (4) and (5) cannot prohibit rescission of acceleration of the claim of the 10% Indenture Trustee.  First, clauses (4) and (5) relate only to liens.  *Solutia* appears to include that the stay prevents rescission of acceleration, with respect to a redemption premium, because it somehow "triggers" a lien.  Of course, the lien

securing the claim for redemption premium is valid and was fully perfected long before the rescission, so this point is simply incorrect.  And such a conclusion would lead to a bizarre consequence – unsecured notes with redemption premium provisions would have broader rescission rights than secured creditors with redemption premiums and constitutionally protected property rights in their collateral.  That cannot be.

39.     Second, section 362(a)(3) is said to apply because rescission "is a direct attempt to get more property from the debtor and the estate, either through simple increase in the amount of a pro-rata plan distribution or though recovery of a greater amount of the collateral which secured the claim."  *Solutia*, 379 B.R. at 485; *AMR*, 730 F.3d at 103 (citing *Solutia*).  But rescission of acceleration does not "extract" any property from the estate – no one debates that contingent claims are allowable, contingencies may actually occur, and that damages may accrue based on postpetition events, allowable as a prepetition claim.  Every creditor in every bankruptcy case who appears and litigates a claim, disputes a reorganization plan, or otherwise participates in the proceedings, is trying to increase its *pro rata* share of the limited pie at its tier of recoveries, and/or to increase the claim for which it has collateral or priority.  These actions are not stay violations, which encompass only attempts to actually collect or seize property of the estate – to "extract" it from the bankruptcy proceedings.  Asserting a creditor's contractual rights (which form the basis of any allowable claim) within an organized and centralized chapter 11 case is the core of what bankruptcy is, not what it prevents.

**D.**     **The Automatic Stay Does Not Bar Rescission Because Notice is Given to the Trustee, Not the Debtor.**

40.     Delivery of a rescission notice, under the terms of the 10% Indenture, is to be made by the majority debt holders to the 10% Indenture Trustee.  The Debtor is not a recipient of the notice under the 10% Indenture's terms.  Thus, the delivery of a rescission notice, which the Debtor agreed would be accomplished without any act against the Debtor, may be made without interference from the stay.  As the Second Circuit noted in *Sharon Steel*, the "fundamental characteristic of long term debt financing is that the rights of holders of the debt securities are largely a matter of contract." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir. 1982) (citation omitted).

41.     The majority holders' right to deliver notice to a non-debtor third party should be respected, and is not stayed.  It is akin to a draw notice under a letter of credit, which under well-settled law, is not subject to the automatic stay.  *See, e.g.*, *Willis v. Celotex Corp.*, 978 F.2d 146, 148 n.3 (4th Cir. 1992); *In re Skylark Travel, Inc.*, 120 B.R. 352, 354 (Bankr. S.D.N.Y. 1990); *contra In re Twist Cap*, 1 B.R. 284 (Bankr. M.D. Fla. 1979).

**E.**     **The Automatic Stay Cannot Be Construed to Impair the Indenture Trustee's Contractual Right to the Redemption Premium after Holders Rescind an Acceleration**

42.     The filing of a bankruptcy petition gives rise to the automatic stay, but the stay does not divest a non-debtor contract counterparty of the benefit of their bargain.  This is one of the most fundamental principles of creditors' rights in bankruptcy.  As recognized by the Supreme Court:

> Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code.  The "basic federal rule" in bankruptcy is that state law governs the substance of claims, Congress having "generally left the determination of property rights in the assets of a bankrupt's estate to state law.  Unless some federal interest requires a different result, there is no reason why [the state] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

*Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 20 (2000) (citations omitted); *see also Official Comm. of Asbestos Claimants v. Asbestos Prop. Damage Comm.* (*In re Federal-Mogul Global Inc.*), 330 B.R. 133, 156 (D. Del. 2005) ("It is, after all, a general principal in bankruptcy law that, for bankruptcy purposes, state law governs the validity and amount of a claim.");  *In re School Specialty, Inc.*, 2013 Bankr. LEXIS 1897, No. 13-10125 (Bankr. D. Del. Apr. 22, 2013) (allowing claim for redemption premium, recognizing that "[t]he inquiry into whether a prepayment provision will be enforced in bankruptcy begins with whether the prepayment provision is enforceable under applicable state law").

43.    The Second Circuit in *AMR* stated that rescinding an acceleration "would be an attempt to modify contract rights and would therefore be subject to the automatic stay." *AMR*, 730 F.3d at 102.  That proposition is flawed – one does not modify the contractual rights of another party when acting pursuant to the terms of the contract.  What the Debtors seek here is to impose a result based on <u>half</u> of the contract; the half that provides for automatic acceleration on a bankruptcy filing, without regard to the other half that gives the creditor the right to decelerate.  The Bankruptcy Code does not

provide for allowance/disallowance of claims after the debtor cherry-picks from a contract the provisions that it likes.

     **F.**     **Construing the Automatic Stay to Impair the Indenture Trustee's Claim is Contrary to the Basic Structure of the Bankruptcy Code**

44.     The purpose of the automatic stay is to bring all litigation and collection efforts within the confines of a debtor's bankruptcy case.  "[T]he stay "protects the bankrupt's estate from being eaten away by creditors' lawsuits and seizures of property before the trustee has had a chance to marshal the estate's assets and distribute them equitably among the creditors."  *Maritime Electric Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991).  "The stay does not determine a creditor's claim but merely suspends an action to collect the claim outside the procedural mechanisms of the Bankruptcy Code.  Therefore, staying [the creditor's] attempt to collect pre-petition escrow amounts does not bar [the creditor] from asserting its contractual rights in the bankruptcy court."  *In re Rodriguez*, 629 F.3d 136, 141-42 (3d Cir. 2010) (citing *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348 (5th Cir. 2008)).

45.     Thus section 362(a) does <u>not</u> impair the claims of state-law creditors. Indeed, Congress enacted an entirely separate section of the Bankruptcy Code – section 502(b) – that imposes special federal limits on specific types of claims, for a very limited number of situations.  *See id.* at 1207 ("[J]udicial acts and proceedings in violation of the automatic stay are void ab initio is consistent with the stay's function of enabling the bankruptcy court to decide whether it will exercise its power under section 502(b) of the Bankruptcy Code to establish the validity and amount of claims against the debtor or allow another court to do so, thereby preventing a 'chaotic and uncontrolled scramble for

the debtor's assets in a variety of uncoordinated proceedings in different courts.'"

(citations omitted)).  For example, Congress limits lease rejection damages under section

502(b)(6).  *See* 11 U.S.C. § 502(b)(6).  "Just as Congress' choice of words is presumed to

be deliberate, so too are its structural choices."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*,

133 S. Ct. 2517, 2529 (2013).  Other limits on allowability of claims would have been

placed structurally in section 502, not left as an implicit indirect result of section 362(a).

The Debtors (and junior creditors) are in effect seeking to create a new provision of the

Bankruptcy Code that would belong in section 502(b), where none exists.

>  **G.**    **Any Construction of the Automatic Stay That Reduces Secured**
>    **Creditors' Underlying State Law Claims Is Unconstitutional**

46.    Construing the automatic stay to impair the holders' right to the

redemption premium violates the holders' constitutionally protected state law rights.

"Secured credit represents property rights that ultimately find a minimum level of

protection in the takings and due process clauses of the Constitution."  *Bank of N.Y. Trust*

*Co. v. Official Unsecured Creditors' Comm.* (*In re Pacific Lumber Co.*); 584 F.3d 229,

236 (5th Cir. 2009) (citing  *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555,

589-90, (1935) (takings clause); *Wright v. Vinton Branch of the Mountain Trust Bank*,

300 U.S. 440, 470 (1937) (due process clause); *Dewsnup v. Timm*, 502 U.S. 410, 418-19

(1992) (citing *Radford* with approval)).  Indeed, Congress recognized that secured

creditors – the most protected class of prepetition creditors in bankruptcy – can have their

rights stayed or otherwise procedurally or substantively adjusted (e.g., cram down to the

full allowed claim under state law), but secured creditors should not be deprived of the

economic benefit of their state law rights.  For example, the legislative history to section

361 of the Bankruptcy Code demonstrates the extent of protections afforded to secured

creditors in bankruptcy:

> The concept [of adequate protection] is derived from the Fifth Amendment protection of property interests. *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940*); Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935). It is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. <u>Secured creditors should not be deprived of the benefit of their bargain.</u> There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest. <u>Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.</u>

H.R. REP. NO. 95-595, at 339 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6295

(emphasis added).

47.    As set forth above, section 502(b) of the Bankruptcy Code – not the

automatic stay of section 362 – is the provision by which Congress limited certain state

law rights in bankruptcy. The automatic stay cannot be construed – particularly through

a strained interpretation of the word "assess" – to substantively impair the holders' state

law rights to the redemption premiums.

## III.    TO THE EXTENT THE AUTOMATIC STAY IS APPLICABLE, CAUSE EXISTS TO LIFT THE STAY

48.    The automatic stay is a procedural device, not a substantive one. It

provides a "breathing spell" from collection efforts. *In re Schaefer Salt Recovery, Inc.*,

542 F.3d 90, 100 (3d Cir. 2008); *see also In re Rodriguez*, 629 F.3d 136, 141-42 (3d Cir. 2010).  Accordingly, the Bankruptcy Code provides various reasons for relief from the stay, most notably a broad standard of "for cause" relief.  11 U.S.C. § 362(d)(1) ("On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . for cause.").  Courts are to determine "cause" based on the totality of the circumstances in each particular case.  *Baldino v. Wilson (In re Wilson)*, 116 F.3d 87, 90 (3d Cir. 1997).  "Cause" for modification of the automatic stay "is an intentionally broad and flexible concept that permits . . . a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations."  *In re Texas State Optical, Inc.*, 188 B.R. 552, 556 (Bankr. E.D. Tex. 1995).

49.    As described in the Complaint and above, actual rescission of acceleration of the 10% Notes is not necessary for allowance of the redemption premium claim, both as a matter of contract and, separately, because such rescission rights gives rise to a claim.  Bankruptcy courts understandably prefer to interpret the stay broadly in the first instance, to provide the Debtors a breathing spell.  But the corollary of that procedural protection is that bankruptcy courts must provide stay relief when it is necessary to prevent harm to substantive economic rights.

50.    Thus, courts employ a balancing test to evaluate whether cause exists to lift the stay.  *In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010).  The factors courts generally use in determining whether cause exists are (1) whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay; (2) whether the hardship to the non-bankrupt party by maintenance of the stay

considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits.  *Id.*

### A.    Cause Exists to Avoid Impairment of Secured Creditors' State Law Rights

51.    As discussed above, it is a fundamental principle of bankruptcy law that "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."  *Raleigh*, 530 U.S. at 20 (citations omitted); *Rodriguez*, 629 F.3d at 141-42. Accordingly, to the extent the stay applies, cause exists to lift the automatic stay to avoid impairing the holders' entitlements under state law.  In addition, stay relief for the right to rescind is warranted insofar is it may be alleged that rescission may affect the 10% Indenture Trustee's rights against junior lien noteholders under the Collateral Trust Agreement.

### B.    Cause Exists Because the Majority Holders' Right to Rescind is Part of the Holders' Prepetition Secured Claim

52.    The majority holders' right to rescind acceleration – albeit a contingent and unmatured right at the time of the bankruptcy filing – is part of the holders' prepetition claim.  *See* 11 U.S.C. § 101(5) (expansively defining "claim" to include any "right to payment, whether or not such right is . . . fixed, contingent, matured, unmatured, disputed, [or] undisputed.").  The contingent nature of exercising a right to rescind acceleration does not change the fact that the right is part of the prepetition secured claim. *See* 11 U.S.C. § 502(b)(1) (providing that claims shall be allowed except to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any

agreement or applicable law for a reason other than because such claim is contingent or unmatured.").

53.     The Supreme Court has repeatedly recognized that the Bankruptcy Code's definition of "claim" is the broadest possible.  *See F.C.C. v. NextWave Personal Comm'cs Inc.*, 537 U.S. 293, 303 (2003) ("We have said that '[c]laim' has 'the broadest available definition,' and have held that the 'plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation, regardless of the objectives the State seeks to serve in imposing the obligation.'") (citations omitted).  "[T]he contingent nature of the right to payment does not change the fact that the right to payment exists, even if it is remote, and thereby constitutes a 'claim' for purposes of § 101(5)."  *In re Rodriguez*, 629 F.3d at 142; *see also In re Grossman's Inc.*, 607 F.3d 114, 121 (3d Cir. 2010) ("The House and Senate Reports make explicit that the effect of the definition 'is a significant departure from [then] present law' which did not define 'claim.'  In adopting the new definition of 'claim,' the Reports state that '[b]y this broadest possible definition [of the term 'claim'] . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case . . . [and] permits the broadest possible relief in the bankruptcy court.") (citations omitted); *In re New Century TRS Holdings, Inc*., 2013 WL 5231456, at *3 (Bankr. D. Del. Sept. 17, 2013) ("[A] 'claim' can exist under the Code before a right to payment exists under state law.") (citations omitted).

54.     Bankruptcy cases are replete with prepetition claims that are contingent on postpetition events.  As also mentioned above, a creditor's prepetition claim can include

amounts for post-petition attorneys' fees.  *See, e.g.*, *Ogle v. Fid. & Deposit Co. of Md.*, 586 F.3d 143, 146 (2d Cir. 2009).

55.     Another example is a contract that permits the non-debtor counterparty to extend the contract period by written notice to the debtor.  If the debtor files for bankruptcy before the non-debtor was required to send written notice to renew the contract, damages for the renewal period are nevertheless part of the counterparty's prepetition claim for rejection damages.  *See In re W. Chestnut Realty of Haverford, Inc.*, 177 B.R. 501, 506 (Bankr. E.D. Pa. 1995) ("The measure of the damages of a party to a rejected executory contract is a question of state law."); *Billet Promotions, Inc. v. IMI Cornelius, Inc.*, No. 95-1376, 1998 WL 721081, at *14 (E.D. Pa. Oct. 14, 1998) (nonbreaching party awarded damages for the renewal period under state law because "there was evidence sufficient for a jury to conclude by a preponderance of the evidence that [the nonbreaching party] would have exercised its option" to renew the contract); *Coinmach Corp. v. Marion County Hous. Auth.*, No. 05-CV-852-WDS, 2006 WL 742030, at *1 (S.D. Ill. Mar. 17, 2006) (nonbreaching party's claim for damages properly included damages under state law for the renewal period where the nonbreaching party's anticipated renewal of the lease was not "speculative and conclusory").  The contractual right to rescind acceleration by written notice is analytically identical.

56.     While courts may prefer a broad construction of the stay, the broader the interpretation of the stay, the more careful a court must be to avoid a result that causes the stay's procedural effects to substantively change the amount of a claim.  If the Court believes that rescission of acceleration is stayed, in many cases a lift-stay could wait.  But

in this case, it is the EFIH Debtors who are proposing a redemption transaction on an accelerated timeframe at the beginning of the case – a transaction that they concede would trigger the premium if done outside of bankruptcy. This is a debtor prepared and focused on a particular transaction. There is no need for a breathing spell. All that is occurring is an attempt by the EFIH Debtors to change that breathing spell into a substantive rule of claims disallowance.

57.    All of the noteholders' rights – including the right to rescind acceleration – are part of their prepetition claim. As set forth at length above, the automatic stay cannot be construed to reduce the noteholders' entitlements at state law. Accordingly, to the extent that the automatic stay is construed to potentially alter such state law entitlements, cause exists to lift the stay.

## NOTICE

58.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Debtors; (iii) counsel to the Official Committee of Unsecured Creditors; and (iv) all parties having requested service under Rule 2002-1(b) of the Local Rules.

## NO PRIOR REQUEST

59.    No prior request for the relief sought in this Motion has been made to this or any other court.

## CONCLUSION

60.    For the foregoing reasons, the 10% Indenture Trustee and the EFIH 10% First Lien Noteholders respectfully request that the Court enter an order (i) confirming

that the automatic stay does not apply to the sending of any notice to the 10% Indenture Trustee by a majority of holders of the 10% Notes to rescind acceleration of the 10% Notes and its consequences as provided for in sections 6.02 and 6.04 of the 10% Indenture, or (ii) in the alternative, granting relief from the automatic stay for a majority of holders to send such notice.

[*Remainder of Page Left Intentionally Blank*]

Dated:  May 15, 2014

COLE, SCHOTZ, MEISEL, FORMAN
& LEONARD, P.A.


/s/ Norman L. Pernick
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: 302-652-3131
Facsimile:  302-652-3117
npernick@coleschotz.com
kstickles@coleschotz.com

ROPES & GRAY LLP
Mark R. Somerstein
Keith H. Wofford
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  212-596-9000
Facsimile:  212-596-9090
Mark.Somerstein@ropesgray.com
Keith.Wofford@ropesgray.com

Warren A. Usatine
25 Main Street,
P.O. Box 800
Hackensack, NJ 07602
Telephone: 201-489-3000
Facsimile:  201-489-1536
wusatine@coleschotz.com


D. Ross Martin
Andrew G. Devore
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Telephone: 617-951-7000
Facsimile: 617-951-7050
Ross.Martin@ropesgray.com
Andrew.Devore@ropesgray.com

*Counsel for CSC Trust Company of Delaware, as successor indenture trustee, and the EFIH 10% First Lien Noteholders*

DRINKER BIDDLE & REATH LLP
James H. Millar
1177 Avenue of the Americas
41st Floor
New York, NY 10036-2714
Telephone:  212-248-3264
Facsimile:   212-248-3141
James.Millar@dbr.com

*Counsel for CSC Trust Company of Delaware, as successor indenture trustee*